KIM S. KLIEGER AND SANDRA J. KLIEGER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Klieger v. Commissioner
Docket Nos. 14096-90, 14477-90, 15000-90, 15341-90, 15343-90, 24138-90, 10334-91, 10388-91
United States Tax Court
T.C. Memo 1992-734; 1992 Tax Ct. Memo LEXIS 782; 64 T.C.M. (CCH) 1624; December 30, 1992, Filed *782 Decisions will be entered for respondent in docket Nos. 15343-90 and 10388-91. Decisions will be entered under Rule 155 in docket Nos. 14096-90, 14477-90, 15000-90, 15341-90, 24138-90, and 10334-91. Ps were moderate income investors, most of whom had neither a college education nor training in business, financial, and income tax matters. Ps made payments to acquire interests in one or more tax shelter programs that were sham transactions without economic substance. On their Federal income tax returns, prepared by the tax shelter promoter, Ps claimed income tax deductions and credits purportedly attributable to these programs. Ps conceded all adjustments determined in R's statutory notices of deficiency, but argued on cross-motions for partial summary judgment that they were entitled to deductions under sec. 165(c), I.R.C., for the loss of their out-of-pocket expenditures to acquire interests in these programs. We held in Omerza v. Commissioner, T.C. Memo. 1992-206, by which all Ps have agreed to be bound, that inasmuch as the programs were shams, Ps were not entitled to deductions under sec. 165(c)(2), I.R.C., for their unreturned cash outlays even *783 though R stipulated for purposes of the motions that Ps had a profit motive. We also held that Ps were not entitled to a theft loss deduction in 1986 under sec. 165(c)(3), I.R.C.
The issues remaining for decision are whether Ps are liable for additions to tax and increased interest. 1. Held: Ps are liable for additions to tax for negligence because they invested in sham transactions and did not seek or reasonably rely on the advice of independent financial or tax advisers. Sec. 6653(a), I.R.C.
2. Held, further, Ps substantially understated their income tax liabilities for the years in issue and did not have substantial authority for the return treatment of the tax shelter items. Sec. 6661(a) and (b), I.R.C. Ps are therefore liable for additions to tax under section 6661(a), I.R.C.Held, further, R did not abuse her discretion by not waiving these additions. Sec. 6661(c), I.R.C.; Mailman v. Commissioner, 91 T.C. 1079 (1988). 3. Held, further, Inasmuch as the tax shelters in which Ps had an interest were sham transactions without economic substance, Ps' underpayments of tax were attributable to tax motivated transactions. *784 Sec. 6621(c)(3)(A)(v), I.R.C. Ps are therefore liable for the increased rate of interest provided by sec. 6621(c), I.R.C.
For Petitioners: Mark E. Gammons. For Respondent: Dawn M. Krause. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: 1. Kim S. & Sandra J. Klieger, Docket No. 14096-90
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6659(a)
6661(a)
1986
$ 15,781
$ 789.05
[1]
$ 2,818.20
$ 1,596.75
2. Richard J. & Virginia H. Thornton, Docket No. 14477-90
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661(a)
1986
[1] $ 16,007 *785 $ 805.60
[2]
$ 4,001.75
3. Robert W. & Margit I. Ryall, Docket Nos. 15000-90 & 10388-91
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661(a)
1986
$ 13,115
$ 655.75
[1]
$ 3,278.75
1987
-0-  504.00
[2]
2,521.00
4. Thomas E. & Mary B. Griffith, Docket No. 15341-90
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6659(a)
6661(a)
1986
$ 22,701
$ 1,135.05
[1]
$ 3,513.90
$ 2,747
5. Glenn A. & *786 Juanita M. Cullin, Docket No. 15343-90
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661(a)
1986
$ 11,945
$ 597
[1]
$ 2,986
6. Leroy J. & Betty J. Omerza, Docket No. 24138-90
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661(a)
1986
$ 11,782
$ 589
[1]
$ 2,946
7. Charles E. Brown, Docket No. 10334-91
Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661(a)
1983
$ 912
$ 46
[1] *787 ---    1986
5,365
268
[2]
$ 1,341.25
1987
5,472
274
[3]
1,368.00
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. The issues in these consolidated cases arise out of petitioners' interest in one or more of the tax shelter programs known as Gifts Advertising (Gifts), Bingo Leasing (Bingo), and Pairware Research and Development (Pairware) (collectively the Programs). With the exception of some concessions by respondent and the question of the deductibility of petitioners' out-of-pocket losses, petitioners have stipulated respondent's adjustments in their Federal income tax liabilities for the years at issue. In addition to deficiencies in Federal income tax, respondent also determined that petitioners were liable for various additions to tax and increased interest. Respondent has conceded the additions to tax under section 6659(a) for valuation overstatements; hence, petitioners Klieger and Griffith are not liable for those *788 additions. After these concessions and stipulations, the issues that remain for decision are: (1) Whether petitioners are liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations; (2) whether petitioners are liable for additions to tax under section 6661(a) for substantial understatement of income tax; and (3) whether petitioners are liable for increased interest under section 6621(c). For the reasons discussed below, we hold that petitioners are liable for additions to tax under sections 6653(a) and 6661(a) and increased interest under section 6621(c). FINDINGS OF FACT The facts that have been stipulated are so found, and we incorporate them by this reference. A. General Factual Background
During the taxable years 1986 and 1987, petitioners made payments to acquire interests in one or more of the Programs (Gifts, Bingo, and Pairware). The Programs were promoted by Thomas A. Graham (Graham) of Graham & Associates, [2] a self-styled investment counselor, tax expert, and financial adviser. Graham, in conjunction with his associate, Joe Tribble, who was also an employee of the Lincoln Electric Co., solicited petitioners *789 to participate in the Programs. Graham and Tribble told petitioners that they would make long-term profits and would obtain short-term tax benefits by participating in the Programs. Graham and Tribble represented that the tax benefits of the Programs would allow participants to defer paying tax until they were making profits on their investments. Graham and Tribble advised petitioners to reduce the amounts withheld from their wages and salaries by increasing the number of exemptions claimed on their withholding certificates (Forms W-4) and to use the extra take-home pay to make the initial payments needed to acquire an interest in the Programs. Petitioners signed notes, on which they made few if any payments, for the balances due under the Programs. Graham & Associates, through its tax return preparation division, *790 Management Accounting Tax & Service, prepared petitioners' Federal income tax returns for the years in issue. These returns were prepared at no additional charge and petitioners understood that tax return preparation was one of the services for which they were paying Graham. In addition, petitioners were led to believe that Graham & Associates, through its attorney John N. Moore, would represent them at no additional charge if audited by the IRS in connection with the Programs. Petitioners Thornton, Ryall, Griffith, and Cullin were originally represented by Mr. Moore when they filed their petitions, but he withdrew shortly thereafter. The only other assistance petitioners received from Graham and Associates, after the audit had begun, was a letter from Graham to all Gifts participants stating the purported legal authority for the advertising deductions reported on their returns. Graham & Associates did not provide petitioners with any other help in dealing with the IRS audits of their returns. During the years in issue, petitioners acquired interests in the following Programs promoted by Graham & Associates: Programs
Petitioner
Year
Gifts
Bingo
Pairware
Klieger
1986
Yes
No
Yes
Thornton
1986
Yes
No
No
Ryall
1986
Yes
Yes
No
1987
Yes
No
No
Griffith
1986
Yes
No
Yes
Cullin
1986
Yes
No
No
Omerza
1986
Yes
No
No
Brown
1983 [1]
N/A
N/A
N/A
1986
No
No
Yes
1987
Yes
No
No
*791 The Programs purported to operate as set forth below: 1. Gifts Advertising
Graham & Associates established an advertising agency called Marketing Complex, Inc. (MCI), that developed a cooperative advertising campaign known as Gifts Advertising. Graham & Associates told petitioners that Gifts was a revolutionary advertising campaign designed to allow merchants in shopping malls to pool their advertising resources. Graham & Associates told petitioners that the merchants would place ads on bingo gamecards that would be distributed to shoppers after they registered with a Gifts representative at the mall. The cards had pull tabs with 25 numbers printed on them arranged in a 5 x 5 bingo-card grid format. Each day numbers would be announced over the radio and posted on a bingo board in the center of the mall. Participating shoppers would pull the corresponding tabs on their bingo cards, and if the numbers on the card resulted in a bingo (five numbers in a row), the shopper was eligible *792 to win a prize. The grand prize was a Caribbean cruise and second prize was a trip to Disney World in Orlando, Florida. Merchants in the participating shopping malls also would advertise on the bingo cards. Under each pull tab there was a coupon for discounts at various stores in the mall, such as a 10-percent discount at Fanny Farmer's candy or a free scoop of ice cream at Baskin Robbins. These advertisements were called "footprints". If the premium appealed to the shopper, the shopper could take advantage of it; if not, the shopper could discard the bingo card. Petitioners received promotional literature from MCI describing Gifts. One memorandum read in part: GIFTS is the smartest advertising decision you ever made. The most exciting advertising opportunity ever created, GIFTS has stirred the marketing and advertising media to their foundations. For the first time, an unlimited amount of sponsoring businesses, broadcasters, individuals and organizations are cooperating to offer the consumer an endlessly exciting and dazzling array of prizes, premiums, and rebates. The result is a totally interactive multi-media advertiser/consumer network that answers the questions *793 and fulfills the needs of the marketers and the marketplace. GIFTS finds out how advertising dollars work - and makes those dollars work to the maximum.
Petitioners assumed business names like "North Coast Solutions of Ohio" and "LoBo Investments" and purported to represent shopping mall merchants. Under these assumed business names, petitioners signed advertising agreements obligating them to pay MCI an advertising fee of $ 32,000 for 100 footprints [3] that were to be printed on 100,000 reprints of the bingo game cards. Petitioners had the option of (A) paying MCI $ 32,000 up front, or (B) making a $ 3,200 initial payment and executing a full recourse promissory note in favor of MCI for the balance, payable in 60 monthly installments at annual interest rate of 10 percent compounded. All petitioners elected option B. *794 On Schedule C of their Federal income tax returns, as prepared by Graham & Associates, petitioners reported that they were using the accrual method of accounting and claimed advertising deductions in the year they signed the Gifts agreements and promissory notes equal to the full amount they purportedly paid MCI under the Gifts agreement. Petitioners claimed the following deductions: Petitioner
Year
Advertising Deduction
Klieger
1986 $ 32,000
Thornton
1986
[1] $ 64,000
Ryall
1986 $ 32,000
1987 $ 32,000
Griffith
1986 $ 32,000
Cullin
1986 $ 32,000
Omerza
1986 $ 32,000
Brown
1983
N/A
1986
N/A
1987
[2] $ 16,000
In addition, petitioners claimed various miscellaneous expense deductions in connection with their interests in *795 Gifts. After making the $ 3,200 initial payment, petitioners made few, if any payments on the notes they signed to acquire an interest in Gifts. Although there is no evidence on how petitioners were supposed to make profits from this arrangement, it appears that Gifts was actually put into effect during the Christmas Holiday season in 1987 at the Euclid Square Mall near Cleveland, Ohio. In his letter of April 18, 1988, in response to numerous inquiries by Gifts participants whose 1986 returns had been audited by the IRS, Graham explained that the advertising deductions were legitimate because all participants had "established an accrual basis Sole Proprietorship marketing company" and were entitled to the advertising deductions under section 162. Graham attached to this letter copies of sections 162 and 461 and Commerce Clearing House (CCH) explanations of those provisions as well a copy of F.E. Booth Co. v. Commissioner, 21 B.T.A. 148 (1930), which Graham described as a "Tax Court case dealing with cooperative advertising * * * [that] has never been overturned." [4]
*796 2. Bingo Leasing[5]
This Program was similar to Graham's Children's Classic Audio Cassettes program. [6] Graham set up a leasing agency, Sonya, Inc., to purchase copyrights of bingo games from "Great Games" and "Besst Bingo Card Co." Sonya purportedly would pay Great Games and Besst $ 60,000 per copyright and purchased 28 copyrights, for a total of $ 1,680,000. Sonya was to pay the sellers a $ 17,000 initial payment for each copyright, with the balance being financed over 5 years at 10-percent simple interest.
*797 Sonya purchased the copyrights in order to develop and produce bingo games. In addition to the copyright agreements, Sonya executed a second agreement that gave Besst the right to print, market, and sell the bingo gamecards. Sonya would, in turn, receive a $ 1.06 royalty from Besst for every $ 3,000 of gamecards that Besst sold. Besst mailed several pieces of promotional material to Graham's investors. One such promotional letter stated that Besst Bingo Card Co. had the support of one Charles Chevron, who was alleged to have extensive experience in the printing business. The letter also stated that Besst had easy access to paper from Buckeye Paper, a nearby paper supplier. Participants in the Bingo Leasing program signed a lease agreement with Sonya, the owner of the copyrights, and entered into an agreement with MCI to advertise the bingo gamecards produced by Besst. The terms of the lease agreement were that participants, as the lessees, would pay Sonya $ 6,750 to lease a predetermined copyrighted bingo game. The particular game was unknown to the participant/lessee. The lessee was also required to pay Sonya 50 percent of the gross sales proceeds on Bingo games for the *798 subsequent 5 years of the lease. The terms of the advertising agreement with MCI required Bingo participants, as advertisers, to pay MCI an $ 8,000 advertising fee. The fee could either be paid in cash in full, or by making a $ 750 initial payment and executing a full recourse promissory note payable to MCI in the amount of $ 7,250. The note was payable over 60 months at 10-percent simple interest. In addition, the advertiser was required to pay MCI 19 percent of the gross receipts from bingo gamecard sales. 3. Pairware Research and Development
Pairware participants agreed to pay T.E.S.T., Inc., a software research and development company controlled by Graham, to develop one of a variety of computer software packages with names such as "The Addition Grid" and "Apples", to be operated on Commodore personal computers. The software was supposed to be educational, entertaining, and challenging for students at all levels. Participants agreed to pay T.E.S.T. $ 3,125 upon execution of the software agreement and $ 20,625 upon completion of the research, but not later than December 31, 1991. Participants also agreed to pay T.E.S.T. 25 percent of the gross receipts from the exploitation *799 of the software. Participants also agreed to make monthly cash payments of an unknown amount. Upon the development and production of the software, Pairware participants could exploit the software through mass production and sales. Attached to the Pairware agreement were photocopied excerpts from a CCH explanation of the Tax Reform Act of 1986 and the Research Institute of America's (RIA) Federal Tax Coordinator 2d describing the research tax credit provided in section 41 of the Internal Revenue Code of 1986. B. Petitioners
1. Klieger
Petitioners Kim S. and Sandra J. Klieger were residents of Highland Heights, Ohio, when they filed their petition. The Kliegers first contacted Graham & Associates in early 1986. At that time, Mr. Klieger was employed by Progressive Casualty Insurance Co. and managed the company's computer programming staff. However, he had no business experience in the research and development of computer software. Mr. Klieger had studied electrical engineering for 2 years at the University of Akron, but did not complete that or any other program for a degree. Mr. Klieger had no training in business, marketing, or Federal income taxation and was *800 not an experienced investor. Mr. Klieger heard about Graham's tax shelter programs from colleagues at work. After becoming interested in these and other tax shelter programs, Mr. Klieger contacted Graham & Associates and met Joe Tribble. Tribble first talked to Mr. Klieger about financial planning and then turned to "investment opportunities," i.e., tax shelters. Tribble described investments in limited partnerships, a term Mr. Klieger did not fully understand, and told Mr. Klieger that the investments offered through Graham & Associates would produce tax benefits that would be invested in the limited partnership. Tribble told Mr. Klieger that in order to acquire an interest in Gifts he would have to execute a promissory note in the amount of $ 32,000 plus interest and share the entrepreneurial risks of the program. Until Mr. Klieger bought into the Programs, his income tax returns were prepared by Ed Westwood, a professional tax return preparer. After meeting Tribble, Mr. Klieger asked Mr. Westwood whether the tax shelter programs Tribble had proposed were legitimate and suitable for him and his wife. Mr. Klieger also inquired whether an investor like himself, without experience *801 or a large amount of capital, should invest in such programs. The record does not reveal what advice Mr. Westwood gave petitioners. Mr. Klieger regarded Graham & Associates as his tax and financial advisers and, except for the meeting with his former tax return preparer, Mr. Klieger never attempted independently to verify any of the representations made by Graham & Associates about the validity or the feasibility of Gifts or Pairware. Once the Kliegers became involved with Graham & Associates, they did not continue to have Mr. Westwood prepare their tax returns because one of the services Graham & Associates offered (and they had paid for) was income tax return preparation. Tribble told Mr. Klieger that Graham & Associates was in continuous contact with the IRS, that IRS agents frequently visited their offices, and that the IRS was fully aware of the Gifts and Pairware programs. Tribble thereby gave Mr. Klieger the impression that the investments offered by Graham & Associates were legitimate and approved by the IRS. On December 30, 1986, Mr. Klieger executed the Gifts agreement appointing MCI as his advertising agency and a "Full Recourse Promissory Note" in favor of MCI in *802 the amount of $ 32,000 at 10-percent interest compounded monthly for a 60-month period. On the same date, Mr. Klieger executed the Pairware "Software Development Agreement" obligating him to pay T.E.S.T. $ 23,750. Mr. Klieger made a $ 3,125 initial payment and promised to pay $ 20,625 upon completion of the new computer software. After the execution of these notes, Tribble sent Mr. Klieger various promotional materials about Gifts. These materials included literature describing the way Gifts purported to operate, sample bingo gamecards, and purported transcripts of Gifts radio commercials and promotional skits. Mr. Klieger also received general information about the progress of the Gifts campaign and how it was allegedly faring in shopping malls in Florida. When Mr. Klieger inquired whether Gifts was operating successfully, Tribble reassured them that Gifts was successful, but never offered any specific details. The Kliegers reviewed their 1986 Federal income tax return prepared by Graham & Associates before signing it, but did not understand "the underpinnings of the numbers". When Mr. Klieger asked Tribble about the numbers reported on the returns, he did not get a clear *803 answer. Mr. Klieger never had a discussion with anyone from Graham & Associates regarding the basis of the numbers reported on their 1986 income tax return. Although Mr. Klieger thought that the $ 32,000 advertising deduction and $ 23,750 deduction for research and development expenses taken on Schedule C of his 1986 return appeared to be out of the ordinary, he believed that the deductions were correct in light of the general explanations that Tribble gave him. Mr. Klieger reasoned that since he was making monthly payments to MCI on the promissory notes, he was "in business" and entitled to the business deductions taken on the return. The Kliegers had been paying down the notes they signed, but, at some point in 1987, they stopped doing so after Tribble advised them that they did not need to make any more payments. MCI and T.E.S.T. have never tried to collect the unpaid balances on the notes. 2. Thornton
Petitioners Richard J. and Virginia H. Thornton were residents of Marblehead, Ohio, when they filed their petition. Mr. Thornton is a high school graduate who was employed as a mechanic at National Engineering when he acquired interests in Gifts. Mrs. Thornton also *804 is a high school graduate. Mr. Thornton has no training in accounting, advertising, business, or taxation. Until he became involved with Graham & Associates in 1985, Mr. Thornton had invested in company stock plans and Mrs. Thornton prepared their joint income tax returns. Prior to buying into Gifts, the Thorntons had purchased an interest in a Graham & Associates ice cream machine tax shelter program that had never returned any money to them. When they decided to buy into Gifts, they thought that it would provide them with up-front tax benefits and an income stream thereafter. Mr. Thornton relied on the word of colleagues at National Engineering, who were not business or tax professionals, that Gifts was a good investment. The Thorntons never read any promotional material about Gifts and never sought any independent professional advice about the economic feasibility or tax validity of Gifts. They relied on information provided by Graham & Associates contained in the Gifts agreement and on Graham's word that "everything was legal". Mr. and Mrs. Thornton did not negotiate any of the terms in either the Gifts Advertising agreement or the $ 57,600 promissory note they signed. *805 Mr. Thornton did not understand the terms of those documents which he and his wife signed on December 24, 1986, the same day they first met Tribble. Although Mr. Thornton had not verified Tribble's credentials or business background, he assumed that Tribble had experience in advertising and marketing. At the time he acquired an interest in Gifts, Mr. Thornton was getting ready to retire and believed that he was making an investment that, within a year, would generate a return of approximately $ 250 a month. However, he never received any return on his initial cash outlay. Mr. Thornton made a cursory review of his 1986 income tax return prepared by Graham & Associates, but did not question any of the items reported on that return, inasmuch as he did not understand what was being reported on it. He was under the impression that Graham & Associates would represent him at no additional charge if his income tax return was examined by the IRS. Mr. Thornton made only one payment to MCI on one of the notes he executed to acquire interests in either Gifts or the ice cream machine program and did not feel obligated to make any additional payments on those notes. 3. Ryall
Petitioners *806 Robert W. and Margit I. Ryall were residents of Medina, Ohio, when they filed their petitions. Mr. Ryall has a bachelor's degree in business from Baldwin-Wallace College and studied accounting and marketing. In 1986, Mr. Ryall was employed as national sales manager at American Surf Pac Corp. Mr. Ryall has no formal training in Federal income taxation or return preparation. Mr. Ryall first met Tom Graham in 1969 while they were students at Baldwin-Wallace College. Mr. Ryall and Graham were fraternity brothers, roommates, and friends. Mr. Ryall first became involved in tax shelter programs in 1978. At that time, Graham was offering opportunities in TAG Exploration, an oil and gas exploration program. Except for losses that Mr. Ryall "wrote off" for tax purposes, his investment in TAG Exploration was a total loss and did not produce any profits. Despite this experience, Mr. Ryall later acquired interests in four more programs offered by Graham: Stablegate, Battaglia Rehabilitation, Action Energy Systems, and Children's Classic Audio Cassettes. [7]
*807 In the mid-1980s Mr. Ryall was first notified that the IRS was investigating Graham's tax shelter programs, but Mr. Ryall continued to participate in similar types of programs promoted by Graham. In 1986 and 1987, Mr. Ryall bought into Gifts and Bingo after reading MCI's promotional literature on these programs, but did not seek independent advice on their merits, and did not try to verify Graham's expertise in the subject matters of these programs (i.e., advertising and bingo games). When Mr. Ryall signed up for Gifts and Bingo, he thought that they were supposed to yield tax benefits, but he never sought or relied on the advice of an independent tax professional. On December 30, 1986, Mr. Ryall executed the Gifts agreement and promissory note, and made a $ 3,200 initial payment. Although there is no corresponding agreement and note in the record for 1987, Mr. Ryall testified that he executed similar documents in December of that year giving rise to a $ 32,000 advertising deduction claimed on his 1987 income tax return. [8] Mr. Ryall never made any further payments on these notes. *808 4. Griffith
Petitioners Thomas E. and Mary B. Griffith were residents of Hudson, Ohio, when they filed their petition. Mr. Griffith has a high school education. In 1986, he was an airline captain with United Airlines. Mr. Griffith has had no formal training or experience in accounting, advertising, business, marketing, research and development, or taxation. Prior to his involvement with Graham & Associates, Mr. Griffith prepared his own tax returns and invested in U.S. savings bonds, and the United Airlines pension plan and credit union. Mr. Griffith learned about Graham & Associates from fellow airline pilots who said that Graham's programs were "a good deal". Mr. Griffith contacted Tribble, who described the Gifts and Pairware programs and gave him some of MCI's promotional materials. Prior to acquiring an interest in Gifts and Pairware, Mr. Griffith contacted the IRS by telephone about Graham & Associates, but the IRS would not comment on the soundness of any of Graham's programs. Mr. Griffith also called the Better Business Bureau and did not receive any negative information about Graham & Associates. Other than these telephone calls, Mr. Griffith did not try to *809 verify the business experience or reputation of Graham & Associates, Graham, or Tribble and did not request or receive any professional opinions on the validity of Gifts or Pairware. Although Mr. Griffith did not carefully study the promotional materials distributed by Graham & Associates and did not understand how Gifts and Pairware purported to operate, he decided to acquire interest in both programs. On Tribble's recommendation, Mr. Griffith adjusted his Form W-4 withholding certificate and claimed additional exemptions, thereby increasing his net take-home pay. He then used the extra take-home pay to make his initial payments to acquire interests in Gifts and Pairware. On December 30, 1986, Mr. Griffith paid MCI $ 3,200 and executed a recourse note in the amount of $ 28,800 and an agreement to acquire an interest in Gifts. On the same date he entered into a Pairware "software development agreement" and promised to pay T.E.S.T. $ 23,750, $ 3,125 in cash upon execution of the agreement and the balance upon completion of the research and development, but not later than December 31, 1991. Mr. Griffith also agreed to pay T.E.S.T. 25 percent of the gross receipts received from *810 the exploitation of the new "Apples" software to be developed by T.E.S.T. Mr. Griffith did not negotiate the terms of the advertising agreement, the note, or the software development agreement. Mr. Griffith did not know whether Tribble had any experience in advertising, marketing, or research and development. In 1986, Mr. Griffith was 5 years from retirement, and had 5 children and 11 grandchildren. He hoped that Graham's programs would yield some profits for his children and grandchildren. He also expected short-term tax benefits, but also expected to pay income taxes on the profits he would later reap. In November 1987, Mr. Griffith thought he would start seeing profits from Gifts and received a letter from Graham & Associates stating that he would soon receive a check for $ 1,200. That check, however, "never materialized". Mr. Griffith made repeated telephone calls to Graham & Associates about the payment, but was always rebuffed. 5. Cullin
Petitioners Glenn A. and Juanita M. Cullin were residents of Litchfield, Ohio, when they filed their petition. After graduating from high school, Mr. Cullin joined the Air Force, attended aviation flight school, and became a *811 commissioned Air Force pilot. When he left the Air Force, Mr. Cullin started working for the Federal Aviation Administration. While employed with the FAA, he took several supervisory and personnel management courses. In 1986, Mr. Cullin served as an air traffic control supervisor. He had no training in business, accounting, marketing, financial planning, or taxation. At the end of 1986, he bought a restaurant business. Mr. Cullin first encountered Graham & Associates in 1984. Before colleagues at the FAA told him about Graham & Associates' tax shelter programs, Mr. Cullin had invested in financial instruments issued by Investors Diversified Services (IDS). From 1984 to 1986, Mr. Cullin participated in five programs promoted by Graham & Associates: Cardinal Homes, Children's Classic Audio Cassettes, [9] Super Swirl (ice cream machines), Stablegate, and Gifts. *812 He never made any profits from his investments in Cardinal Homes or Gifts [10] and did not know of any FAA colleagues who had made any profits from these programs. In late 1986, Mr. Cullin bought into Gifts. He read some promotional materials about the program that included various newspaper clippings that described Gifts' success in other parts of the country. After reading this information and discussing it with Graham and Tribble, Mr. Cullin believed that he would make a profit if he participated in the Gifts program. However, Mr. Cullin did not know whether Graham had any experience in advertising or marketing. Mr. Cullin thought that Gifts would yield tax benefits and claimed additional exemptions on his Form W-4 to reduce his income tax withholding. In 1986, he earned over $ 72,000 working for the FAA, but had only a little more than $ 1,500 in taxes withheld from his pay. Mr. Cullin did not consult with anyone in the advertising or marketing industries and did not have an independent professional financial adviser review Gifts' potential for profits. Mr. Cullin did not participate in the drafting *813 of the promissory note that obligated him to pay MCI $ 32,000 plus interest, which was similar to the notes he signed to acquire an interest in CCAC and Super Swirl. Mr. Cullin only made one or two payments on the Gifts note. Graham & Associates prepared the Cullins' 1986 Federal income tax return. Mr. Cullin cursorily reviewed his joint return and assumed that the information reported on Schedule C (a $ 45,950 loss) was correct. The Cullins never called or made an appointment with Graham & Associates about the numbers reported on their 1986 return before they signed and filed it. When the IRS started examining Mr. Cullin's returns, he became concerned about Graham's programs. He had understood that Graham & Associates would handle all tax-related problems with the IRS at no additional charge. At this point, Mr. Cullin started having difficulties contacting Graham. Every time he called Graham's office, he would be rebuffed or would only be able to leave a message on an answering machine. 6. Omerza
Petitioners Leroy J. and Betty J. Omerza were residents of Willoughby Hills, Ohio, when they filed their petition. In 1986, Mr. Omerza was a maintenance foreman with the *814 Lincoln Electric Co. in Euclid, Ohio. He is a high school graduate and took some college-level courses for one semester. Mr. Omerza has no training in advertising, accounting, business, marketing, or taxation. Prior to his involvement with Graham & Associates, Mr. Omerza had invested in Lincoln Electric Co. stock programs. In 1983, Mr. Omerza learned about Gifts through Tribble, who was also a fellow employee at the Lincoln Electric Co. Mr. Omerza had known Tribble for approximately 4 years before Mr. Omerza "[got] involved in the investment business". After hearing about some of Graham's tax shelter programs from associates at Lincoln Electric Co., Mr. Omerza approached Tribble, who introduced him to Graham, who told Mr. Omerza that he was a professional investment, financial, and tax adviser. Because Mr. Omerza trusted Tribble, and therefore Graham, he did not take any steps to verify the background or business reputation of Graham, Tribble, or Graham & Associates. Mr. Omerza also believed that no further investigation of the feasibility of Gifts was required because he was paying Graham & Associates to do that kind of work for him. Over a 4-year period, Mr. Omerza bought *815 into four of Graham's programs: (1) 1983, Ace Two, a solar energy program; (2) 1984, Stablegate, a real estate venture; (3) 1985, Children's Classic Audio Cassettes; [11] and (4) 1986, Gifts. Before Mr. Omerza started buying into these programs, he prepared his own Federal income tax returns. However, Graham & Associates prepared his returns for the years 1983 through 1986. The Omerzas had an opportunity to review their 1986 return before signing it, but did not understand the information reported on it and were unable to formulate any questions about the return as prepared by Graham & Associates. 7. Brown
Petitioner Charles E. Brown was a resident of Cleveland, Ohio, when he filed his petition. Mr. Brown has a bachelor's degree in communications from Cleveland State University. When Mr. Brown bought into Gifts and Pairware, he worked as a staff manager at Ohio Bell, translating into layman's *816 language technical manuals written by AT&T and Northern Telecom. Other than a course in basic accounting during his freshman year at Cleveland State, Mr. Brown has had no training in business or accounting. Mr. Brown has no training in financial planning, marketing, advertising, computer software research and development, or taxation. Prior to buying into Gifts and Pairware, Mr. Brown had invested in the Ohio Bell credit union and 401(k) retirement plan. Mr. Brown learned about Graham's tax shelter programs from fellow employees at Ohio Bell. Before he decided to participate in Graham's programs, Mr. Brown met Tribble, who told him that Gifts and Pairware would yield immediate income tax benefits. On Tribble's recommendation, Mr. Brown reduced the amounts withheld from his pay and Mr. Brown used the extra take-home pay to acquire an interest in Gifts and Pairware. Mr. Brown also expected that these programs would yield long-term profits. Other than a few conversations with fellow Ohio Bell employees, who told him that the Programs were good investments, Mr. Brown never tried to obtain independent professional advice on the economic feasibility of Gifts and Pairware and did *817 not seek any professional advice on the legitimacy of the purported income tax benefits described to him by Graham & Associates. Mr. Brown simply took the word of his friends and Tribble that the programs were good investments and that they were legitimate. Before he signed up with Graham & Associates' programs, Mr. Brown prepared his own income tax returns. Graham & Associates prepared his returns for the years 1986 and 1987. Mr. Brown reviewed those returns before signing them, but did not understand the information reported on them. In the past, his returns had consisted of only a few pages. When Graham & Associates prepared his returns, they contained elaborate schedules and attachments that Mr. Brown did not understand. Mr. Brown signed the returns because he trusted Tribble. ULTIMATE FINDINGS OF FACT The Programs were sham transactions without economic substance. OPINION I. Preliminary Matters
There is no evidence in the record that indicates how Graham used the proceeds of petitioners' initial payments or their payments on their notes. The record does not indicate what Graham and Tribble told petitioners about how they would derive revenue from the Programs, *818 whether there was any such revenue, how it would be shared, whether petitioners' shares of such revenue was sufficient to provide any return to petitioners, or whether the revenue was simply misappropriated by Graham. Petitioners have each stipulated that they will be bound by the Court's decision on the cross-motions for partial summary judgment in Omerza v. Commissioner, docket No. 24138-90, on the question of whether petitioners were entitled to loss deductions under section 165(c) for their unrecovered out-of-pocket expenditures to acquire interests in the Programs. In Omerza v. Commissioner, T.C. Memo. 1992-206, we held, even though it was stipulated for purposes of the cross-motions that the Omerzas participated in Gifts with the intent of making a profit, that they were not entitled to a loss deduction under section 165(c)(2) for their $ 3,200 cash outlay because it was also stipulated that Gifts was a sham transaction without economic substance. In Omerza v. Commissioner, supra, we also held that petitioners were not entitled to a theft loss deduction for 1986 under section 165(c)(3) for their unreturned $ 3,200. As a result of *819 their respective stipulations to be bound by our decision in Omerza v. Commissioner, supra, and their respective stipulations that the Programs were sham transactions without economic substance, petitioners are not entitled to any deductions under section 165(c) in 1986 for their unrecovered cash expenditures to acquire interests in the Programs. By reason of their stipulations, petitioners are liable for the deficiencies in Federal income tax determined by respondent. The remaining issues are their liabilities for additions to tax. Petitioners are taxpayers of modest means who were euchred by Graham, a typical shifty promoter. Graham sold petitioners worthless investments by giving spurious tax advice that induced them to reduce their withholding and turn their excess pay over to Graham as initial payments to acquire interests in "investment programs" that did not produce any economic return and apparently never had any prospects of doing so. Graham purported to fulfill his prophecies about the tax treatment of the Programs by preparing petitioners' tax returns and claiming deductions and credits that have been disallowed in full, with resulting deficiencies in tax. *820 For the reasons set forth below, we hold that petitioners are liable for the additions to tax determined by respondent. II. Additions to Tax and Increased Interest
A. Section 6653(a) -- Negligence
Section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment due to negligence or intentional disregard of rules or regulations. If any part of the underpayment was due to negligence or intentional disregard of rules or regulations, the 5-percent addition to tax is imposed on the entire underpayment. Section 6653(a)(1)(B) imposes an addition of 50 percent of the interest payable under section 6601 on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. The addition to tax for negligence is not designed to penalize taxpayers for making bad investments, which the Programs surely were. The penalty for making a bad investment is the investor's loss of his capital. Rather, the addition to tax for negligence is intended to encourage compliance with the tax laws by requiring additional payments from taxpayers who act negligently in failing to satisfy their income tax obligations. See Spies v. United States, 317 U.S. 492, 495-496 (1943). *821 We have found taxpayers liable under section 6653(a) for claiming income tax deductions arising from sham transactions without making a reasonable investigation into whether they were entitled to such deductions or credits, or reasonably relying on the advice of an independent financial or tax adviser. See, e.g., Rybak v. Commissioner, 91 T.C. 524, 565-566 (1988); Illes v. Commissioner, T.C. Memo. 1991-449, affd. without published opinion 976 F.2d 733 (6th Cir. 1992). Section 6653(a)(3) provides that negligence "includes any failure to make a reasonable attempt to comply with the provisions of this title". Negligence is also defined as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner, 380 F.2d 494, 506 (5th Cir. 1967); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Negligence is measured by an objective standard, Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531, *822 and courts do not look into the taxpayer's mind when deciding whether he acted reasonably or prudently. Instead, they look to what a reasonably prudent person would have done in the circumstances. Id. Petitioners bear the burden of proving that they were not negligent. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). Petitioners contend that they were not negligent because they did not know that the Programs were shams when they bought them and filed their returns, and that they relied completely on Graham and Tribble, who they believed were competent professionals in the areas of business, investments, and income taxes. Reliance on the advice of a professional may defeat a finding of negligence under certain circumstances. United States v. Boyle, 469 U.S. 241 (1985); Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976). For example, "When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice." United States v. Boyle, supra at 251. *823 However, neither Graham nor Tribble were "tax professionals" in the sense used by the Supreme Court in Boyle; they were merely tax shelter promoters. Relying on the advice of the promoter of a tax shelter program with respect to the tax treatment of an item in connection with that program is not reasonable or prudent. Nor is it reasonable to rely on a tax shelter promoter's advice about the substantive merits of the program. See Patin v. Commissioner, 88 T.C. 1086, 1131 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); see Rogers v. Commissioner, T.C. Memo. 1990-619. Petitioners invite us to follow the Fifth Circuit's holding in Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, *824 and reject respondent's determinations of additions to tax for negligence. In Heasley v. Commissioner, supra, moderate income taxpayers, like some petitioners in the cases at hand, participated in an energy conservation tax shelter scheme known as OEC. See Soriano v. Commissioner, 90 T.C. 44 (1988), and Heasley v. Commissioner, T.C. Memo. 1988-408, for a description of the OEC program. Because the taxpayers did not know how to report on their returns the items of tax information reported to them by the OEC salesman, and did not understand how to claim a tentative carryback adjustment, they hired a certified public accountant, referred to them by the OEC salesman, to prepare their 1983 Federal income tax return. On their 1983 return, as prepared by the accountant, the Heasleys claimed an investment tax credit under sections 38 and 46 and deductions under section 162 for advance rentals. Because the total credit exceeded their tax liability as reported on their 1983 return, the Heasleys carried back the unused credit to 1980 and 1981 and claimed a tentative carryback adjustment, or "quickie refund", for those *825 years. After an examination of the Heasleys' 1983 return, the Commissioner disallowed the claimed investment tax credit and section 162 deduction and determined deficiencies for 1980, 1981, and 1983. The Heasleys conceded they were not entitled to the investment tax credit or the section 162 deductions and agreed to pay the income tax deficiencies for all years in question. The Commissioner also determined that, among other additions to tax, the Heasleys were liable under section 6653(a) for the negligence addition. We sustained the Commissioner's determinations, but the U.S. Court of Appeals for the Fifth Circuit reversed. Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408. Petitioners argue that we should apply the Fifth Circuit's opinion in Heasley and reject respondent's determinations of negligence. We decline to do so. These cases are appealable to the U.S. Court of Appeals for the Sixth Circuit; therefore, we are not bound to apply the Fifth Circuit's decision in Heasley v. Commissioner, supra, to the cases at hand. See Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), *826 affd. 445 F.2d 985 (10th Cir. 1971); Lawrence v. Commissioner, 27 T.C. 713 (1957), revd. 258 F.2d 562 (9th Cir. 1958). Moreover, the Heasleys had their income tax return prepared by a certified public accountant (albeit a C.P.A. recommended by the salesman), [12] while there is no showing that Graham, Tribble, or Graham & Associates' Management Accounting Tax & Service were qualified tax professionals. Unlike the Heasleys, petitioners did not in fact obtain tax advice from anyone other than the promoters of the tax shelters in question. Petitioners' conduct in claiming deductions and credits to reduce their income tax liabilities for the years in question was imprudent and negligent within the meaning of section 6653(a). Rybak v. Commissioner, 91 T.C. 524, 565-566 (1988); Patin v. Commissioner, supra.
*827 When a tax shelter is a sham devoid of economic substance and a taxpayer relies solely on the tax shelter promoter to prepare his income tax return or advise him how to prepare the return with respect to the items attributable to the shelter that the promoter has sold him, it will be difficult for the taxpayer to carry his burden of proving that he acted reasonably or prudently. Although a tax shelter participant, as a taxpayer, has a duty to use reasonable care in reporting his tax liability, the promoter who prepares the participant's tax return can be expected to report large tax deductions and credits to show a relatively low amount of tax due, and thereby fulfill the prophecies incorporated in his sales pitch. In the circumstances of these cases, tax shelter participants trying to avoid the negligence addition on the ground of reasonable reliance must show that they reasonably relied on the advice of a qualified and independent tax professional, not the tax shelter promoter. Petitioners have stipulated deficiencies in Federal income tax arising from their interest in Gifts, Bingo, and Pairware. Petitioners have also stipulated, and we have found as ultimate facts, that these *828 Programs were sham transactions without economic substance. Because petitioners' underpayments were due to their participation in sham transactions and they did not reasonably rely on the advice of independent financial and tax advisers in claiming the asserted tax benefits, petitioners negligently understated their income tax liabilities and are liable for additions to tax under section 6653(a). We would reach the same conclusion even if it were possible that one or more of petitioners had a subjective profit motive when they bought into the Programs. The standard for negligence under section 6653(a) is reasonableness, which is an objective standard. Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531. Whether the taxpayer had a subjective profit motive is not dispositive in determining whether he acted negligently. We conclude that petitioners' conduct was objectively unreasonable and that they are therefore liable for the additions to tax for negligence. B. Section 6661 -- Substantial Understatement
Section 6661(a) provides for an addition to tax equal to 25 percent of an underpayment *829 of income tax attributable to a taxpayer's substantial understatement of income tax liability. Petitioners bear the burden of proving that they are not liable for this addition to tax. Rule 142(a); King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 517 (1992). An "understatement" is defined as the excess of the amount of tax required to be shown on the return over the amount actually shown on the return. Sec. 6661(b)(2)(A). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). For all years in issue, petitioners' understatements were substantial within the meaning of section 6661(b)(1)(A). In general, if the taxpayer had "substantial authority" for his tax treatment of the item in question, then there is no "understatement," and the taxpayer may escape liability for this addition to tax with respect to that item. Sec. 6661(b)(2)(B)(i). There also is no such "understatement" if the taxpayer adequately disclosed the tax treatment of the item. Sec. 6661(b)(2)(B)(ii). However, where the item in question is attributable to a tax shelter, *830 [13] the disclosure exception will not apply, sec. 6661(b)(2)(C)(i)(I), and the substantial authority exception will apply only if there was substantial authority for the treatment of the item on the return and the taxpayer reasonably believed that his treatment of the item was more likely than not the proper tax treatment. Sec. 6661(b)(2)(C)(i)(II); sec. 1.6661-5, Income Tax Regs.
The Programs were tax shelters within the meaning of section 6661(b)(2)(C)(ii) and petitioners could not have avoided the additions for substantial understatement even if they had adequately disclosed the nature of these items on their returns. Sec. 6661(b)(2)(C)(i)(I). Moreover, petitioners never disclosed, so they could not satisfy *831 the test even if these were not tax shelter cases. Cf. sec. 1.6661-6(c), Income Tax Regs. (automatic waiver (other than for tax shelter items) if the taxpayer discloses on an amended return). The remaining issue therefore is whether petitioners both had substantial authority for their treatment of the items in question and reasonably believed that such treatment was more likely than not the proper tax treatment. See sec. 1.6661-5(a)(1), Income Tax Regs. By April 15, 1987, this Court had filed numerous tax shelter opinions holding that sham transactions lacking economic substance would be disregarded for tax purposes. See, e.g., Helba v. Commissioner, 87 T.C. 983 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988); James v. Commissioner, 87 T.C. 905 (1986), affd. 899 F.2d 905 (10th Cir. 1990); Falsetti v. Commissioner, 85 T.C. 332 (1985). In view of contrary authority invalidating income tax deductions and credits for sham tax shelters such as the Programs, petitioners did not have a reasonable basis for taking *832 these deductions and credits, much less substantial authority. Even though petitioners may not have understood what Graham & Associates reported on their returns, and may not have realized that the Programs were shams, they do not escape the substantial understatement additions on the ground that they had "substantial authority". Secs. 1.6661-3(a)(2), 1.6661-5(a)(1), Income Tax Regs.; see Schirmer v. Commissioner, 89 T.C. 277, 284 (1987). Petitioners argue that, despite their lack of substantial authority, respondent abused her discretion in not waiving the section 6661 additions. Section 6661(c) provides that: (c) Authority to Waive. -- The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.
The standards for reasonable cause and good faith are provided in section 1.6661-6(b), Income Tax Regs. That regulation provides that the most important factor in determining reasonable cause and good faith is "the extent of the taxpayer's effort to assess * * * [his] proper *833 tax liability under the law." The Commissioner also may consider the taxpayer's experience, knowledge, and education. Id. The standard of review that we employ is whether the Commissioner abused her discretion in not waiving the section 6661 addition to tax. 5 U.S.C. sec. 706(2)(A) (1988); Mailman v. Commissioner, 91 T.C. 1079, 1083-1084 (1988). Inasmuch as the waiver is entirely within the Commissioner's discretion, we will not second-guess the Commissioner unless she exercised her discretion arbitrarily, capriciously, or without sound basis in fact. Capitol Federal Savings & Loan v. Commissioner, 96 T.C. 204, 213 (1991); Mailman v. Commissioner, supra at 1084. This is a narrow standard of review. See Manocchio v. Commissioner, 78 T.C. 989, 1000 (1982), affd. 710 F.2d 1400 (9th Cir. 1983); Dittler Bros., Inc. v. Commissioner, 72 T.C. 896, 910 (1979), affd. without published opinion 642 F.2d 1211 (5th Cir. 1981). In Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), *834 revg. T.C. Memo. 1988-408, the U.S. Court of Appeals for the Fifth Circuit held that because the taxpayers obtained independent professional tax advice, lacked business experience, and did not have the benefit of any post-secondary education, they acted reasonably and in good faith when they reported their 1983 income tax liability. Id. at 385 (citing sec. 1.6661-6(b), Income Tax Regs.). Thus, the Fifth Circuit held that it was an abuse of discretion for the Commissioner to refuse to waive the section 6661 addition. In reaching its conclusion, the Fifth Circuit stated that the taxpayers in Heasley v. Commissioner, supra, had exhausted their administrative remedies, id. at 382, and that the Commissioner "refused to waive the penalties" under section 6661(c). Id. at 385. It thus appears that the Heasleys actually requested a section 6661(c) waiver and that their request was denied. By contrast, petitioners have not shown, and we cannot find, any evidence that any of them ever requested such a waiver. Petitioners simply argue that respondent "should waive the addition to tax determined under the provisions of I.R.C. Section 6661 because *835 the Petitioners acted in good faith when they reported their tax liability." We will not hold that the Commissioner abused her discretion in not waiving the section 6661 addition when petitioners have not shown that they requested section 6661(c) waivers. See Magnus v. Commissioner, T.C. Memo. 1990-596; Lapin v. Commissioner, T.C. Memo. 1990-343, affd. 956 F.2d 1167 (9th Cir. 1992). The authority to waive the section 6661 additions rests with the Commissioner, not with this Court. Sec. 6661(c); sec. 1.6661-6(a), Income Tax Regs.; see Cruz v. Commissioner, T.C. Memo. 1990-594. Because petitioners have not shown that they requested waivers under section 6661(c) and that respondent denied those requests, there is no exercise of administrative discretion for us to review. We therefore hold that there was no abuse of discretion in not waiving the section 6661 additions. Assuming, for argument's sake, that petitioners properly requested waivers, we would have found nonetheless that respondent did not abuse her discretion in denying them. Petitioners did not rely *836 on independent professional advice, as did the Heasleys, and have not shown a reasonable basis for their treatment of the items in question. Nor is this a case where taxpayers have been the unintended victims of a heavy tax penalty. The addition for the substantial understatement of tax liability was enacted by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, to curb tax shelter abuse and to discourage taxpayers from playing the "audit lottery" by taking highly questionable return positions without disclosure in the hope that they would not be detected by the IRS. See S. Rept. 97-494 (Vol. 1), at 272-274 (1982). The positions taken on petitioners' returns with respect to tax shelter items were highly questionable. Even if petitioners had requested section 6661(c) waivers, it would not have been arbitrary and capricious for respondent to deny them. Sec. 1.6661-6(b), Income Tax Regs.; see Illes v. Commissioner, T.C. Memo. 1991-449, affd. without published opinion 976 F.2d 733 (6th Cir. 1992); Rogers v. Commissioner, T.C. Memo. 1990-619. We therefore hold *837 that petitioners are liable for additions to tax under section 6661 for substantially understating their income tax liabilities for the years in issue. C. Section 6621(c)
Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" (an underpayment in excess of $ 1,000) in a taxable year "attributable to 1 or more tax motivated transactions". Sec. 6621(c)(1) and (2). Petitioners bear the burden of proving that the increased interest rate is not applicable. Rule 142(a); Rybak v. Commissioner, 91 T.C. 524, 567 (1988). Petitioners argue that we should follow the result in Heasley v. Commissioner, supra at 383-384, and hold that they are not liable for increased interest under section 6621(c). However, their reliance on Heasley is misplaced. Congress amended section 6621(c)(3)(A) in the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1535(a), 100 Stat. 2750, to include any sham or fraudulent transaction as a "tax motivated transaction". Sec. 6621(c)(3)(A)(v). The amendment applies (1) to any underpayment with *838 respect to which there was not a final court decision before the enactment of the Act (October 22, 1986), and (2) to interest accruing after December 31, 1984. Price v. Commissioner, 88 T.C. 860, 888 (1987); DeMartino v. Commissioner, 88 T.C. 583 (1987), affd. without published opinion sub nom. McDonnell v. Commissioner, 862 F.2d 308 (3d Cir. 1988), affd. 862 F.2d 400 (2d Cir. 1988); see H. Conf. Rept. 99-841 (Vol. II) (1986), 1986-3 C.B. (Vol. 4) II-796. Section 6621(c)(3)(A), as amended to include sham transactions among the list of tax motivated transactions, applies in this case. This provision, however, was not discussed in Heasley v. Commissioner, supra.
The parties have stipulated and we have found as ultimate facts that the Programs were sham transactions without economic substance; therefore, the increased interest rate provided in section 6621(c) applies to the extent petitioners' underpayments were attributable to such transactions. Rybak v. Commissioner, 91 T.C. 524, 568 (1988); Patin v. Commissioner, 88 T.C. 1086, 1127-1129 (1987), *839 affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Because all of petitioners' underpayments in tax were attributable to their interests in the Programs, we hold that petitioners are liable for increased interest under section 6621(c). Petitioners argue that section 6621(c) should not apply to them because, when they bought into the Programs, they did not realize they were sham transactions without economic substance, and that they had an actual profit motive. Petitioners rely on Rousseau v. United States, 91-1 USTC par. 50,252 (E.D. La. 1991), a case appealable to the Fifth Circuit and decided after Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, as support for this argument. Rousseau is factually *840 distinguishable from the present cases. In Rousseau, the taxpayer made a reasonable investigation and sought and relied on professional tax advice from an independent C.P.A. Moreover, the transactions in Rousseau were not found to be sham or fraudulent transactions. In the present case, by contrast, petitioners have stipulated that the Programs were shams, which is dispositive of their liability for increased interest under the plain language of section 6621(c)(3)(A)(v). To reflect the foregoing, Decisions will be entered for respondent in docket Nos. 15343-90 and 10388-91.
Decisions will be entered under Rule 155 in docket Nos. 14096-90, 14477-90, 15000-90, 15341-90, 24138-90, and 10334-91. Footnotes
1. Cases of the following petitioners are consolidated herewith: Richard J. Thornton and Virginia H. Thornton, docket No. 14477-90; Robert W. Ryall and Margit I. Ryall, docket Nos. 15000-90 and 10388-91; Thomas E. Griffith and Mary B. Griffith, docket No. 15341-90; Glenn A. Cullin and Juanita M. Cullin, docket No. 15343-90; Leroy J. Omerza and Betty J. Omerza, docket No. 24138-90; and Charles E. Brown, docket No. 10334-91.↩
1. 50 percent of the interest due on $ 15,781.↩
1. Respondent also determined a $ 105 deficiency in Federal excise tax pursuant to sec. 4973 for an excess contribution to an individual retirement account. This deficiency has been conceded and is not here at issue.↩
2. 50 percent of the interest due on $ 16,112 (now on $ 16,007 after reduction for the excise tax deficiency).↩
1. 50 percent of the interest due on $ 13,115.↩
2. 50 percent of the interest due on $ 10,085.05.↩
1. 50 percent of the interest due on $ 22,701.↩
1. 50 percent of the interest due on $ 11,945.↩
1. 50 percent of the interest due on $ 11,782.↩
1. 50 percent of the interest due on $ 912.↩
2. 50 percent of the interest due on $ 5,365.↩
3. 50 percent of the interest due on $ 5,472.↩
2. Thomas A. Graham was a partner with his brother, John Graham, in Graham & Associates. However, John Graham did not directly participate in the promotion of the Gifts, Bingo, or Pairware programs.↩
1. 1983 was a carryback year.↩
3. Petitioners Thornton and Brown signed agreements to make payments of $ 64,000 and $ 16,000 respectively. However, the agreement Mr. Thornton signed does not reflect that he was purchasing 200, rather than 100, footprints.↩
1. The Thorntons doubled, from $ 3,200 to $ 6,400, the amount usually charged to buy into Gifts.↩
2. Mr. Brown's advertising agreement is not in the record, but it appears that he paid one-half of the amount usually charged to participate in Gifts.↩
4. This case does not deal with "cooperative advertising" in the sense that Gifts was a cooperative advertising campaign. The case holds that advertising expenses must be deducted in the year incurred or paid rather than being spread over a period of years.↩
5. See Cross v. Commissioner, T.C. Memo. 1992-715, for a detailed discussion of the operation of Bingo, based upon the more extensive record developed by the parties in that case. Our decisions in the cases at hand are identical to the results in Cross↩.
6. See Illes v. Commissioner, T.C. Memo. 1991-449, affd. without published opinion 976 F.2d 733↩ (6th Cir. 1992).
7. See Ryall v. Commissioner, T.C. Memo. 1992-103↩, on appeal (6th Cir., Aug. 10, 1992).
8. The Ryalls filed an amended 1987 income tax return and removed the claimed $ 32,000 advertising deduction, and the $ 156 tax preparation and $ 100 random processing deductions for that year because they wanted to avoid a potential dispute with the IRS.↩
9. See Cullin v. Commissioner, T.C. Memo. 1992-71, affd.    F.2d     (6th Cir., Dec. 9, 1992↩).
10. The record does not reveal whether Mr. Cullin made any profits from any of the other programs offered by Graham & Associates in which he participated.↩
11. See Omerza v. Commissioner, T.C. Memo. 1992-113↩ on appeal (6th Cir., Aug. 17, 1992).
12. Mr. Klieger's discussion with his previous tax return preparer is not sufficient to carry his burden of proof on this issue. The record only discloses that he visited that preparer but does not reveal what the preparer told him. It appears that the purpose of Mr. Klieger's visit was to inform the preparer that he would no longer be using his services.↩
13. Sec. 6661(b)(2)(C)(ii) defines a tax shelter as: (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement,↩
if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.