David E. HEASLEY and Kathleen
Heasley, Petitioners,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent.

No. 88–4950.

United States Court of Appeals,
Fifth Circuit.

June 5, 1990.

Andrea Winters, John D. Copeland, Dallas, Tex., for petitioners.

Gary R. Allen, William Rose, Asst. Atty. Gen., William S. Estabrook, Tax Div. U.S. Dept. of Justice, William F. Nelson, Chief Counsel, I.R.S., Washington, D.C., for respondent.

Before GOLDBERG, POLITZ, and JONES, Circuit Judges.

GOLDBERG, Circuit Judge:

### Statement of Facts

Between 1981 and 1983, Gaylen Danner, a self-styled economic and financial consultant and securities dealer, introduced Kathleen and David Heasley to numerous investment plans. Before meeting Danner, the Heasleys invested in a mutual fund plan and held $3,000 in stocks as part of Mr. Heasley's job benefit plan. They had no other investment experience. Both held blue collar jobs. Neither Heasley graduated from high school, although Ms. Heasley earned a G.E.D. and 18 college credits, one course at a time. Worried about their future and that of their four children, but not knowledgeable enough to invest on their own, the Heasleys accepted Danner's investment advice.

In December, 1983, Danner introduced the Heasleys to the investment that generated this lawsuit. Danner told the Heasleys that the O.E.C. Leasing Corporation ("O.E.C.") had an energy conservation program ("the plan") that would generate the future income they sought. The plan required the Heasleys to lease energy savings units ("units") from O.E.C. at $5,000 per unit per year. O.E.C. valued the units at $100,000 each. A service company then installed the units in businesses ("end users"). The units reduce energy consumption, thus reducing end users' energy bills. The end users would pay a percentage of their utility savings to investors such as the Heasleys. The higher the price of energy, the more money saved, and the greater the return on the investment.[1]

Danner reviewed the O.E.C. prospectus with the Heasleys. They focused on the cash flow charts, which showed a positive cash flow of $2,000 in 1984 increasing to $11,876 in 1992. Danner also discussed the investment's tax advantages. Already somewhat familiar with the home version of the energy savings unit, the Heasleys believed the O.E.C. investment would generate future income.

The Heasleys invested $10,000 to buy two units and $4,161 for start-up costs, including installation, telephone hook-ups, and insurance. In a late December closing, they signed documents Danner prepared, including service agreements for the two units. The manufacturer of the units later sent the Heasleys warranty cards, unit serial numbers, and photographs of the units. The servicing agent sent them photographs and addresses of the businesses where the servicing agent installed the two units.

In the past, the Heasleys always prepared their own tax returns. However, they did not know how to report the O.E.C. investment. At Danner's suggestion, the Heasleys employed Gene Smith, a C.P.A., to prepare their 1983 tax return. Smith reviewed the O.E.C. prospectus and the accompanying tax and legal opinions and found everything in order. He then deducted the $10,000 advance rents for the two units and claimed a $20,000 investment tax credit.[2] Because the investment generated a larger investment tax credit than the Heasleys could use in 1983, Smith carried the investment tax credit back to 1980 and 1981. As a result of the O.E.C.-generated deduction and investment tax credit, the Heasleys received more than $23,000 in refunds for the three years from the Internal Revenue Service ("I.R.S."). The Heas-

---

**1.** For a more detailed description of the plan, see the tax court's memorandum below, *Heasley v. C.I.R.,* 55 T.C.M. 1748 (1988); and *Soriano v. I.R.S.,* 90 T.C. 44 (1988).

**2.** The unit owners may pass the investment credit through to the lessee but must limit the lessee's basis to the property's fair market value. 26 U.S.C. Section 48(d). The investment credit cannot exceed ten percent. 26 U.S.C. Section 46(a)(2) and (b)(2). In the calculation necessary to arrive at the $20,000 figure, Smith assumed a $100,000 basis for each unit.

leys used the refunds to recoup the money they invested in the plan. They also invested $3,000 of the refunds in a time share plan recommended by Danner. They put $10,000 of the money into a certificate of deposit as collateral for one of Danner's business loans.

Despite Danner's rosy predictions and the Heasleys' high hopes, the Heasleys earned not one penny off of the units or any other of Danner's suggested investments. Even worse, they lost every penny they invested with Danner (more than $25,-000). Their loss exceeded the tax refund generated by the plan.

In 1986, the I.R.S. sent the Heasleys a prefiling notification letter. The Heasleys contacted Danner. He assured them that their investment would pass muster with the I.R.S. Danner was wrong. In September, 1986, the I.R.S. totally disallowed the $10,000 advance rental payments and the $20,000 investment tax credit. As a result, the Heasleys' income tax liability increased by approximately $23,000 plus interest. The I.R.S. also assessed penalties totaling $7,419.75: a $1,153.05 negligence penalty allowed by 26 U.S.C. Section 6653(a)(1); a $5,940.90 valuation overstatement penalty allowed by 26 U.S.C. Section 6659; and a $325.80 substantial understatement penalty allowed by 26 U.S.C. Section 6661. The I.R.S. also increased the interest due on the disallowed investment tax credit under 26 U.S.C. Section 6621(c).

After exhausting their administrative remedies, the Heasleys sued the I.R.S. They do not dispute the tax deficiency but instead challenge the I.R.S.'s assessment of penalties. The tax court found for the I.R.S. The Heasleys appealed. We must decide whether the tax court erred in upholding the I.R.S.'s assessment of the penalties and interest. We need not decide, nor did the tax court decide, the Heasleys' tax liability.

*Standard of Review*

We presume that the I.R.S. correctly determined the Heasleys' taxes and penalties. *See Sandvall v. I.R.S.*, 898 F.2d 455, 457–58 (5th Cir.1990). The Heasleys bear the burden of proving otherwise. *See Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *Sandvall*, 898 F.2d at 457–58; *C.A. White Trucking Co. v. I.R.S.*, 601 F.2d 867, 869 (5th Cir.1979). We reverse the tax court's factual finding that the Heasleys did not support their claimed deductions only if the tax court clearly erred; *Sandvall*, 898 F.2d at 458; *Masat v. I.R.S.*, 784 F.2d 573, 575 (5th Cir.1981); but review the tax court's findings of law *de novo*. *San Antonio Savings Ass'n v. I.R.S.*, 887 F.2d 577, 581 (5th Cir.1989), *reh. den.* 894 F.2d 1335. We find clear error if we firmly and definitely believe that the tax court made a mistake. *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1044 (5th Cir.1987).

*Discussion*

*Section 6659:*

*The Valuation Overstatement Penalty*

■ The I.R.S. may impose a valuation overstatement penalty for any underpayment of tax "attributable to a valuation overstatement." [3] Section 6659(a). The Heasleys overvalued each unit by $95,000.[4] Because the Heasleys overvalued the units, the I.R.S. imposed the valuation overstatement penalty. The tax court upheld the penalty. The court reasoned that the Heasleys's $10,000 investment tax credit depended upon the value of the units. "Thus," the court concluded, "to the extent the underpayment is due to the disallowed credits, the underpayment is attributable to a valuation overstatement." Mem. Op. at 21.

---

**3.** 26 U.S.C. Section 6659(a) (repealed) provided:
Addition to the tax.—If—
 (1) an individual, or
 (2) a closely held corporation or a personal service corporation,
has an underpayment of the tax imposed by chapter 1 for the taxable year which is attributa-

ble to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable.

**4.** They valued the units at $100,000 each. The units were worth about $4,800 each.

After the tax court issued its opinion in this case, we interpreted the meaning of "attributable to a valuation overstatement" in *Todd v. I.R.S.*, 862 F.2d 540 (5th Cir. 1988).[5] In *Todd,* as in this case, the I.R.S. completely disallowed the taxpayer's deductions and credits. On appeal, we compared Todd's actual tax liability (without the improperly claimed deductions and credits) with his actual tax liability including the valuation overstatement. *Todd,* 862 F.2d at 542–543. We arrived at the same figure for both calculations because the I.R.S. completely disallowed the deductions and credits containing the valuation overstatement. Because we arrived at the same figure, we concluded that Todd's valuation overstatement did not attribute to the underpayment. Therefore, the I.R.S. could not assess a valuation overstatement penalty.

We see no reason to treat this case any differently than *Todd.* Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit. In this case, the Heasleys' actual tax liability does not differ one cent from their tax liability with the valuation overstatement included. In other words, the Heasleys' valuation overstatement does not change the amount of tax actually owed. Therefore, the I.R.S. erred when it assessed the valuation overstatement penalty and the tax court erred as a matter of law by upholding that assessment.[6]

### Section 6653:

### The Negligence Penalty

 The I.R.S. may penalize taxpayers for any underpayment due to negligence or disregard of rules and regulations.[7] Section 6653(a). "Negligence" includes any failure to reasonably attempt to comply with the tax code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. *Sandvall,* 898 F.2d at 458; *Marcello v. I.R.S.,* 380 F.2d 499, 506 (5th Cir.1967); Section 6653(a)(1). "Disregard" includes careless, reckless, or intentional disregard. Section 6653(a)(3). A taxpayer may not be negligent but still may intentionally disregard rules and regulations, and thus violate Section 6653(a). *Marcello,* 380 F.2d at 506.

The tax court found that the Heasleys acted negligently because they neither independently investigated O.E.C. nor read the entire prospectus or the closing documents. However, the tax court held the Heasleys to a far too-stringent standard for determining negligence.

First, due care does not require moderate-income investors such as the Heasleys to independently investigate their investments. They may rely on the expertise of their financial advisors and accountants (as did the Heasleys).[8] If we require moder-

---

5. *See also Gainer v. I.R.S.,* 893 F.2d 225 (9th Cir.1990) (agreeing with *Todd* ); *McCrary v. I.R.S.,* 92 T.C. 827 (1989) (following *Todd* ). *But see Irom v. I.R.S.,* 866 F.2d 545 (2d Cir.1989) (distinguishing *Todd* ).

6. Because we find that the penalty does not apply, we need not decide whether the tax court erred when it held that the I.R.S. did not abuse its discretion by refusing to waive the penalty in this case.

7. 26 U.S.C. Section 6653(a) provides:
 Negligence.—
 (1) In general.—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to negligence (or disregard of rules or regulations), there shall be added to the tax an amount equal to 5 percent of the underpayment.

 * * * * * *

 (3) Negligence.—For purposes of this subsection, the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term "disregard" includes any careless, reckless, or intentional disregard.

8. Other courts apparently agree. For example, in *Betson v. I.R.S.,* 802 F.2d 365, 372 (9th Cir. 1986), the Ninth Circuit refused to uphold a negligence penalty because the taxpayer relied in good faith on an accountant's advice. *See also Gaddis v. U.S.,* 330 F.Supp. 741, 760–762 (D.C.S.D.Miss.1971); *Miller v. U.S.,* 211 F.Supp. 758, 760–761 (D.C.Wyo.1962); *Conlorez Corp. v. I.R.S.,* 51 T.C. 467 (1968) (no negligence or

ate-income investors to independently investigate their investments, the start-up investigation costs may prevent them from investing at all. If the costs do not prohibit entry, these investors still may not invest because the investigation costs may far exceed their potential profit.[9]

Second, investors need not pore over every word in a prospectus or in closing documents. They exercise reasonable care by reading pertinent portions and having their advisors explain the rest. This rule particularly applies to unsophisticated investors, such as the Heasleys. In these cases, financial advisors, more than the investors, understand the advantages and disadvantages of particular investments and can explain them to the investors. As the Supreme Court recently noted:

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. "Ordinary business care and prudence" do not demand such actions.

*United States v. Boyle*, 469 U.S. 241, 251, 105 S.Ct. 687, 692–693, 83 L.Ed.2d 622 (1985) (emphasis in original) (construing "reasonable cause" in 26 U.S.C. Section 6651(a)(1)).

Third, the Heasleys monitored their investment. They received regular statements from the servicing agent. When they did not receive any income from the two units, they wrote and telephoned the servicing agent to collect their portion of the energy savings. They could do no more to monitor their investment other than driving to the businesses and demanding the money themselves. Due care does not require them to do so.

Given the Heasleys' honest misunderstandings of law and fact, *see Allen v. I.R.S.*, T.C. Memo. 303 (1982), their reliance on financial advisors, and their efforts to monitor their investment, they did not act negligently. Therefore, the I.R.S. erred by assessing the negligence penalty and the tax court erred by upholding that assessment.

### *Section 6661:*

### *The Substantial Understatement Penalty*

■ The I.R.S. may assess a penalty equal to 25% of any underpayment attributable to a substantial understatement of tax.[10] *Sandvall*, 898 F.2d at 458; Section 6661. The penalty does not apply to that portion of the understatement attributable to a valuation overstatement. Section 6661(b)(3). The I.R.S. may waive any or all of the penalty if the taxpayer shows reasonable cause for the understatement and that she acted in good faith.

According to the I.R.S., the extent of the taxpayer's effort to assess her proper tax

---

intentional disregard because experienced taxpayer relied in good faith on advice of experienced tax accountant). *Cf. Leonhart v. I.R.S.*, 414 F.2d 749, 750 (5th Cir.1969) (to escape Section 6653(a) penalty, taxpayer must show that the accountant reached decision independently after being fully apprised of the facts). *But see Skeen v. I.R.S.*, 864 F.2d 93, 96 (9th Cir.1983) (upheld negligence penalty because the taxpayer justified deduction *only* on the ground that he relied on tax accountant's advice).

**9.** The tax court faulted the Heasleys for consulting Smith because Danner suggested that the Heasleys contact Smith. However, nothing in the record supports a finding that Smith did not

independently assess the Heasleys' tax liability or that Danner influenced Smith's calculations.

**10.** 26 U.S.C. Section 6661 (repealed) provided: (a) Addition to tax.—If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement.

 * * * * * *

(c) Authority to waive.—The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.

liability under the law is the most important factor for determining reasonable cause and good faith. 26 C.F.R. Section 1.6661–6(b). In addition, an honest misunderstanding of fact or law "that is reasonable in light of the experience, knowledge, and education of the taxpayer" may indicate reasonable cause and good faith. *Id.* While reliance on incorrect facts or the advice of a professional, such as an accountant, does not necessarily constitute a showing of reasonable cause and good faith, it may. *Id.* We review the I.R.S.'s waiver decision for abuse of discretion only.

The I.R.S. found neither reasonable cause nor good faith in this case. The I.R.S. found no reasonable cause because the Heasleys "made almost no effort to determine their tax liability." I.R.S. Br. at 38. According to the I.R.S., the Heasleys should have fully read the prospectus and independently verified the investment's validity with someone not connected to Danner. Therefore, the I.R.S. refused to waive the penalties.

The tax court found for the I.R.S. The court concluded that the Heasleys had no reasonable basis for their understatement because the first year's rent ($10,000) exceeded the fair market value of the two units ($9,600). While true, this factual finding does not dispose of the underpayment issue.

Applying the I.R.S.'s own regulatory standards, we find that the I.R.S. abused its discretion by failing to waive the penalty in this case. We are at a loss to determine just what the I.R.S. would find to be reasonable cause given the Heasleys' experience, knowledge, and education. First, the Heasleys attempted to assess their proper tax liability by taking their taxes to a C.P.A., something they never did before. The accountant found no problem with the plan. While Danner suggested that the Heasleys use Smith, nothing else in the record connects the two. Therefore, considering this "most important factor," the Heasleys showed reasonable cause and good faith. Second, the Heasleys read the portions of the prospectus and other O.E.C. materials and relied on Danner to explain the rest. If neither Danner nor their C.P.A. found anything wrong with the investment, how could the Heasleys? Certainly, their failure to out-guess their financial advisor and accountant is not negligence. Finally, the Heasleys believed that they legitimately claimed the deduction and investment tax credit. Given the Heasleys' inexperience and limited knowledge about investing, and their level of education, their misunderstanding is reasonable. The I.R.S. abused its discretion by failing to waive the penalty and the tax court erred by upholding the I.R.S.'s decision.

### Section 6621(c):

### The Additional Interest Penalty

The I.R.S. may assess a penalty for any substantial understatement of tax liability "attributable to" a tax-motivated transaction.[11] Section 6621(c). A "tax-motivated transaction" includes a valuation overstatement. A taxpayer claims a valuation overstatement whenever she claims more than 150% of the correct value of a property. Section 6659(c). In this case, the Heasleys overvalued the units. Therefore, for purposes of Section 6621(c), this is a tax-motivated transaction. However, as we discussed in Section 6659, the understatement is not attributable to a valuation overstatement. Therefore, the I.R.S. may not penalize the Heasleys on this ground.

However, the I.R.S. may specify other types of transactions as "tax-motivated." Section 6621(c)(3)(B). The I.R.S. defines transactions "not engaged in for profit" as tax-motivated. 26 C.F.R. Sec. 301.6621–2T, Q–4, Temporary Procedural and Adminis-

---

11. 26 U.S.C. Section 6621(c)(2) provides: Substantial underpayment attributable to tax motivated transactions—For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

trative Regulations.[12]

■ The tax court found this transaction not engaged in for profit and thus tax-motivated. The tax court found that the plan did not generate income but instead only generated tax deductions and credits. However, the tax court also should have considered the Heasleys' intent when determining whether the Heasleys did not engage in the transaction for profit. Had the tax court done so, it would have found the requisite profit motive. The Heasleys invested in the plan to earn income, not to avoid tax liability. Therefore, the tax court erred when it characterized the Heasley's investment as tax-motivated.

In addition, the I.R.S. may waive the penalty if the taxpayer shows a reasonable basis for the valuation overstatement and that the taxpayer acted in good faith. Section 6659(e). As we noted when discussing Section 6661, the Heasleys established a reasonable basis for their valuation overstatement and that they acted in good faith. Thus, here again, even if Section 6659(e) applied, the I.R.S. abused its discretion by failing to waive the penalty and the tax court erred by upholding the I.R.S.'s decision.

### Conclusion

The I.R.S. should not exact every penalty possible in every case where taxpayers pay less than the full amount of tax due. Here, on rather questionable facts, the I.R.S. did just that. This case simply does not support such draconian efforts. Therefore, we REVERSE the decision of the tax court and the I.R.S.'s assessment of penalties and interest.

---

12. 26 C.F.R. Section 301.6621–2T provides:

Q–4. Are any transaction[s] [sic] other than those specified in A–2 of this section and those involving the use of accounting methods under circumstances specified in A–3 of this section considered tax motivated transactions under A–2(6) of this section?

A–4. Yes. Deductions disallowed under the following provisions are considered to be attributable to tax motivated transactions:

(1) Any deduction disallowed for any period under section 183, relating to an activity engaged in by an individual or an S corporation that is not engaged in for profit, and

(2) Any deduction disallowed for any period under section 165(c)(2), relating to any transaction not entered into for profit.

26 U.S.C. Section 183 provides:

(a) General rule.—In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

26 U.S.C. Section 165(c)(2) provides:

In the case of an individual, the deduction under subsection (a) shall be limited to losses incurred in any transaction entered into for profit, though not connected with a trade or business.