REVISED, April 16, 1998

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

96-60443
_____

TRACY P. STREBER,
TERESA P. DELONEY,
STEPHEN J. DAVIS,

Defendant-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

Plaintiff-Appellee.
_____

Appeals from the United States Tax Court
_____
April 15, 1998

Before KING, JONES, Circuit Judges, and KENDALL,[1] District Judge.

JONES, Circuit Judge:

Two sisters were about 20 and 25 years old when they received over a million dollars each, and they hired a lawyer to advise them on potential tax liability. The Commissioner charged them with negligence and substantial understatement penalties[2] for

_____

[1]District Judge of the Northern District of Texas, sitting by designation.

[2]I.R.C. § 6653(a), which has been amended following the commencement of this action, provided for additions to tax on account of negligence or intentional disregard of rules or regulations. I.R.C. § 6661(a), which has since been repealed, provided, during the years at issue, for an addition to tax in the case of an underpayment due to a substantial understatement.

treating the money as a gift even though they followed one alternative course recommended by the tax lawyer and even though the Commissioner herself relied on their theory in asserting tax liability of the girls' father.[3] Under these circumstances, the Tax Court's imposition of the penalties was clearly erroneous. The Tax Court also erred in holding that Teresa's ex-husband procedurally defaulted his case. We REVERSE.

## I. BACKGROUND

The underlying facts are simplified for present purposes. In 1979, Larry Parker, the girls' father, acquired an interest in 440 acres of undeveloped land known as Northgate Forest Property. At least part of Parker's interest in this joint venture was held on behalf of his daughters, Teresa Deloney and Tracy Streber, who were then aged nineteen and fourteen. On March 4, 1981, two promissory notes in the amount of $2,000,000 each for sale of the land were endorsed, one to Teresa and the other one to Teresa as custodian for Tracy who was still a minor. Both notes were due and payable on March 4, 1985. Neither Teresa nor Tracy was involved in negotiating the terms of the agreement.

At some point, Parker and his then-wife, the sisters' mother, divorced.

When the notes were not paid on the due date, Parker, Teresa, Tracy, and other interested parties filed a suit against

---

[3]On appeal, the daughters do not, however, contest liability for the base amount of tax.

2

the makers of the notes.  On April 23, 1985, the suit was settled, and Teresa and Tracy received eighty-five percent of the face value of the notes, i.e., $1,700,000 apiece.

Within a few weeks, Teresa and Tracy met with attorney Edwin Hunter to discuss the tax consequences of their income from the joint venture.  Hunter provided Teresa and Tracy with two basic alternatives: (1) pay capital gains tax on the income they received; or (2) treat the income as a gift from Parker, who would then be liable for any taxes due on receipt of the money.

Teresa and Tracy chose the latter option.  Neither Teresa, who filed a joint return with her then-husband Stephen Davis, nor Tracy reported receipt of the joint venture income on their 1985 tax returns.  Parker did not report the receipt of the income either.

On October 22, 1991, the Commissioner issued statutory notices of deficiency to Tracy, Teresa, and Stephen for 1985, stating that Tracy and Teresa should have included the joint venture income they received in their 1985 income.  All three filed petitions for redetermination of the deficiency in the Tax Court.

Contemporaneously, the Commissioner, in order to avoid a "whipsaw" situation, also issued a statutory notice of deficiency against Parker and his wife for 1985.  The notice of deficiency was based on the determination that the Parkers should have included in their 1985 income tax return the joint venture income that was paid

3

to Teresa and Tracy. Parker and his wife filed a petition for redetermination of the deficiency in the Tax Court.

Upon a motion by the Commissioner, the Tax Court consolidated all three cases for trial. The Commissioner averred that either the Parkers or Teresa and Tracy were liable for the tax, but not both.

The Tax Court found no deficiency in Parker's 1985 income. Instead, the court found that Parker made a gift to his daughters in 1980, and, therefore, Tracy and Teresa were liable for the taxes on the joint venture income received in 1985. The court also sustained the Commissioner's determination of additions to tax for negligence and substantial understatement against Tracy and Teresa. Finally, the Tax Court found that Davis had failed to prosecute his case and held him in default.

Teresa and Tracy filed a motion for reconsideration of the decisions concerning only the additions to tax. They argued that their actions were based on substantial authority and were reasonable and in good faith. Moreover, they maintained that their decision to treat the money as a gift from Parker was based on the advice they had received from counsel. Davis moved for reconsideration, claiming it was wrong for the court to have held him in default. The Tax Court vacated its decision in order to consider these motions.

Upon reconsideration, the Tax Court held that the sisters' assertion that there was substantial legal and factual

4

justification for their failure to report the joint venture income was not sufficient to convince the court to change its determination that the addition to tax should apply. The Court did not believe that Tracy and Teresa "relied on an expert's advice." The Tax Court found:

> Movants met with an attorney, Edwin K. Hunter (Hunter), who, based on the facts as he knew them, explained to movants alternative tax reporting positions. However, we do not find that Hunter advised movants that they did not have to report the gains in question. The testimony on that point is ambiguous. Hunter, however, was one of the movant's attorneys and was present throughout the trial. Hunter no doubt could have resolved any ambiguity as to what he advised movants. Nevertheless, movants did not call Hunter as a witness. Our rules do not preclude Hunter from testifying. We infer from Hunter's failure to testify that his testimony would have been adverse to movants. Movants cannot claim that, based on expert advice, they acted with due care, or as a reasonable and ordinarily prudent person would act, in the circumstances.

The Tax Court also rejected Davis's claim, holding that Davis had a full opportunity to participate at the trial and did not do so on his own account, although he participated in the proceedings as a witness.

Tracy and Teresa now appeal. They contend that the Tax Court erred in sustaining the Commissioner's assessment of the negligence and substantial understatement penalties. They argue that they reasonably relied on the advice they received from their attorney, and that reliance is not nullified under the factual circumstances of this case where the taxpayers choose one of the

5

alternatives their advisor recommends.[4] Davis filed a separate appeal making the same claim and also arguing that the Tax Court abused its discretion in holding him in default.

## II.  ANALYSIS

### A.  NEGLIGENCE PENALTY

This court reviews the tax court's findings of negligence under the clearly erroneous rule. *See Sandvall v. Commissioner*, 898 F.2d 455, 459 (5th Cir. 1990). Clear error exists when this court is left with the definite and firm conviction that a mistake has been made. *See Chamberlain v. Commissioner*, 66 F.3d 729, 732 (5th Cir. 1995).

"The IRS may penalize taxpayers for an underpayment due to negligence or disregard of rules and regulations. Negligence includes any failure to reasonably attempt to comply with the tax code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. 'Disregard' includes careless, reckless, or intentional conduct." *Heasley v. Commissioner*, 902 F.2d 380, 383 (5th Cir. 1990) (citations omitted).

The relevant inquiry for the imposition of a negligence penalty is whether the taxpayer acted reasonably. *See Reser v. Commissioner*, 112 F.3d 1258, 1271 (5th Cir. 1995). "Taxpayers may not rely on someone with a conflict of interest or someone with no

---

[4]Edwin K. Hunter, appellant's counsel of record before the tax court, filed an amicus curiae brief.

knowledge concerning the matter upon which the advice is given." *Chamberlain*, 66 F.3d at 732. "Good faith reliance on professional advice concerning tax laws is a defense." *Durrett v. Commissioner*, 71 F.3d 515, 518 (5th Cir. 1996).

In this case we find that the Tax Court clearly erred when it sustained the Commissioner's assessment of a negligence penalty, because appellants reasonably relied on the advice they received from their attorney, Edwin Hunter.

Due care does not require young, unsophisticated individuals to independently examine their tax liabilities after taking the reasonably prudent step of securing advice from a tax attorney.[5] At relatively tender ages, the appellants received large sums of money. Tracy Streber testified that she and her sister came to the conclusion that they had to seek advice from an attorney to make sure they did "the legal thing." As she explained:

> It was just known that when you get money like that, some kind of tax had to be paid and we didn't know what it was, so we went to get counseled.
>
> . . . .
>
> I knew that is why you had to go to a tax person.

---

[5]*Cf. Heasley v. Commissioner*, 902 F.2d 380, 383 (5th Cir. 1990) ("[D]ue care does not require moderate-income investors . . . to independently investigate their investments. They may rely on the expertise of their financial advisors and accountants . . . .").

Given their level of understanding in these matters, the appellants took the appropriate steps to secure legal advice from attorney Edwin Hunter to ensure that their tax returns for the upcoming year complied with the law.  Not only Tracy Streber, but also Davis and Betty Berwick (Tracy and Teresa's mother, and Larry Parker's first wife) testified that the purpose of seeking legal advice was to understand the tax consequences of their income from the joint venture and to ensure that any position they took was on sound legal footing.

Hunter advised appellants that they could *either* treat the joint venture income as a capital gain or as a gift from Parker.  Relying on Hunter's opinion, the appellants chose to treat the joint venture income as a gift.  Due care does not require that the appellants challenge their attorney's opinion or independently investigate the propriety of his advice.  *See Chamberlain*, 66 F.3d at 733.  As the Supreme Court held:

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether liability exists, it is reasonable for the taxpayer to rely on that advice.  Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney.  To require the taxpayer to challenge an attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place.  "Ordinary business care and prudence" do not demand such actions.

*United States v. Boyle*, 469 U.S. 241, 251, 105 S. Ct. 687, 692-93 (1985) (citation omitted).  Having done no less than reasonable

8

prudence demands, the appellants should not be held negligent in their treatment of the joint venture income.

The I.R.S. asserts that the Tax Court found that Hunter never advised them "that they did *not* have to report the gains in question." This conclusion, however, is contrary to the overwhelming weight of the evidence, which supports the proposition Hunter did in fact tell the appellants that they should treat the joint venture income as a gift from Parker.

First, according to the witnesses, Hunter advised his clients to select the alternative that would result in more tax revenue for the government and would, therefore, be less likely to receive an I.R.S. challenge. Although the position the sisters ultimately adopted meant that they would not be personally liable for tax on their joint venture income, when Hunter was rendering his advice, the appellants were concerned over the way in which the I.R.S. might have viewed a decision that would have resulted in less tax liability for their father than other positions would have required. The appellants were worried that Parker's own rather questionable practices might make them more susceptible to a government audit and possible penalties if they took anything less than a careful tax position in this case. Tracy Streber testified about the appellants' choice to treat the joint venture income as a gift: "We didn't want to defraud the government. We didn't want them to think we were in cahoots or whatever with my father, to defraud them." Because the gift tax rate was higher than the

9

capital gains tax rate, Hunter stated that the I.R.S. might view the appellants' decision to treat the joint venture income as a capital gain as an attempt to conspire with Parker to limit his tax liability and the tax liability for all the family members.[6]

Second, the evidence shows that Hunter actively supported his clients' position to treat the joint venture income as a gift. In June 1986, for example, Parker's attorney wrote to Hunter encouraging him to reconsider Hunter's filing of the appellants' amended tax returns, which "reflect[ed] their receipt of certain income as a gift from their father."[7] A month earlier, Hunter participated in his clients' efforts to notify the I.R.S. of the possible deficiencies in Parker's 1985 tax return.[8] Given the substantial risks associated with voluntarily reporting to the I.R.S. in this case, it is hard to understand how the Tax Court could have concluded that Hunter would have advised the appellants to take any position other than the one they adopted in this matter. Although the appellants understood that by informing the agency they might receive a financial reward from the government if the information proved useful, they must also have understood that

---

[6]Davis testified that Hunter explained that if they were to choose to treat the joint venture income as a capital gain, it was very likely that the I.R.S. would maintain that they "still have a liability as far as owing tax on the money."

[7]Letter from David S. Gamble, Attorney to Larry Parker, to Edwin K. Hunter 1 (June 25, 1986).

[8]*See* Memorandum of Interview, Internal Revenue Service (May 9, 1986) (noting the presence of Edward K. Hunter, Attorney for Informants, Teresa Davis and Stephen Davis).

this action would highlight their own tax returns for scrutiny.[9] The decision to inform on Parker to the I.R.S. not only placed the appellants at personal risk of a government audit, but it also placed Hunter's professional judgment and reputation under review. In the face of this risk, Hunter actively promoted his clients' tax position. It is impossible to reconcile Hunter's later actions with the Tax Court finding that his initial tax advice to the sisters was "ambiguous" or that he did not actually recommend treating the joint venture income as a gift.[10]

The I.R.S. also contends that Tracy and Teresa did not in fact rely on Hunter's advice, propounded in alternatives, because they made the "ultimate decision" not to report the income from the joint venture on their tax returns. I.R.S. does not dispute that the legal advisor here offered several possibilities and discussed the tax ramifications of each.[11] IRS contends, however, that

---

[9]The Evaluation Report on Claim for Reward makes clear that the information provided to the I.R.S. had substantial value, because otherwise Parker's 1985 tax return would not have been audited.

[10]The dissent does not even mention the correspondence between Hunter and Parker's attorney, which has to be premised on Hunter's advice that the income the girls received was a gift. The dissent, like the Tax Court, casts no doubt on the veracity of Berwick's and Davis's testimony about Hunter's advice. Finally, the dissent unnecessarily flays Hunter over a subsequent legal malpractice action the girls have pending against him. The lawsuit is irrelevant to the question of their lack of negligence and due diligence, at least in a case such as this, where the advice he gave -- that there was a gift -- was sound enough to be the basis of one of I.R.S.'s alternative positions.

[11]The dissent goes even further than the Tax Court did in implying that Tracy and Teresa decided on their own not to report

11

because the Tax Court found he did not affirmatively recommend a preferred course of action, which the taxpayers followed, the reliance on counsel defense is unavailable. We need not reach this conclusion because, overruling the Tax Court's erroneous findings, we find that Hunter did in fact affirmatively advise and vigorously assist taxpayers' chosen course of action. But even if the Tax Court's findings here are accurate, unless circumstances show that a tax advisor discussed *and discounted* alternative tax strategies, the taxpayers should ordinarily not be held negligent for following any of the bona fide alternatives developed by an advisor acquainted with the relevant facts. To find otherwise adds a new requirement to the reliance on counsel defense: not only must the taxpayer show that his advisor discussed how to treat a tax-related transaction, he must also show that the advisor ranked any alternatives hierarchically, and he (the taxpayer) adopted whichever alternative was at the top of the list. Otherwise, the advisor's recommendation in a situation where bona fide alternative tax strategies exist will be found "ambiguous" and cannot furnish the basis for a taxpayer's reasonable reliance. If this proffered method of analysis is not simply a semantical quibble designed to determine the outcome of this case, it drives a mischievous wedge

---

the income from the notes. First, the dissent does not concede, as IRS does, that Hunter advised the girls of alternative tax treatments of the income. Second, the dissent accuses the girls of not furnishing Hunter with appropriate documentation, but neither IRS nor the Tax Court mentioned this sort of problem, which is not inferable from any of the Tax Court's findings.

between advisors and taxpayers.  Advisors will be deterred from recommending alternative tax strategies, and clients will be discouraged from seeking any but the most tax-advantageous advice.

The I.R.S. finally emphasizes that the Tax Court ruled against the appellants because the court did not find Tracy Streber and Teresa Deloney to be credible.  The Tax Court gave their testimony and answers "little weight."  Moreover, in its opinion on reconsideration, the Tax Court noted that Hunter could have testified on behalf of the appellants to clear up any ambiguity that might have existed over whether he, in fact, advised them to treat the joint venture income as a gift from Parker.  Because the appellants chose not to call him as a witness, the court inferred, his testimony would have been adverse to their position.  This reasoning is unpersuasive.

In general, a court may draw a negative inference from a party's failure to produce a witness "whose testimony would elucidate the transaction." *Graves v. United States*, 150 U.S. 118, 121, 14 S. Ct. 40, 41 (1893).  The strength of the inference "is rooted in notions of common sense[,] . . . will vary with the facts of each case," *United States v. Tucker*, 552 F.2d 202, 210 (7th Cir. 1977), and may be drawn only where a witness has information "peculiarly within his knowledge," *McKay v. Commissioner*, 886 F.2d 1237, 1238 (9th Cir. 1989) (citing *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946)).  Thus, a party need not call a witness whose testimony would be cumulative "without any

13

apprehension" that a court will draw a negative inference." 2 John Henry Wigmore, *Evidence* § 287, at 202-03 (Chadbourne rev. 1979).[12]

In this case, the tax court examined the evidence of four witnesses who were privy to Hunter's conversation with his clients. These witnesses, Teresa, Tracy, Davis, and Berwick, all testified that Hunter advised his clients that they could either pay capital gains tax on the income they received or treat the income as a gift from Parker. Even assuming that Teresa and Tracy were not credible, the Tax Court never referred to the testimony of Davis and Berwick, who each confirmed that Hunter did advise his clients to treat the joint venture income as a gift from Parker. Davis said that Hunter "felt from . . . hearing the case and the documents -- he felt that it was a gift." When Berwick was asked why the appellants chose to treat the income as a gift, she answered: "Because Mr. Hunter told them that in his opinion, that was the correct one." Contrary to this testimony, which the Tax Court neither questioned nor commented upon, the court still held that it could not find that "Hunter advised [appellants] that they did *not* have to report the gains in question." Once again, even

---

[12]"In general, put somewhat more strongly, there is a general limitation . . . that the inference cannot fairly be drawn except from the nonproduction of witnesses whose testimony would be superior in respect to the fact to be proved." 2 Wigmore § 287, at 203. Two witnesses -- Berwick and Davis -- whose credibility went unchallenged by the I.R.S. were present during the meeting in which Hunter rendered his advice. Under these circumstances, Hunter's hypothetical testimony could not fairly be characterized as superior to that of these other witnesses. Their testimony of what they heard Hunter say is not a priori inferior to Hunter's possible testimony of what he remembers advising to his clients.

14

assuming Tracy Streber and Teresa Deloney were not credible, at least two other witnesses independently supported the position that Hunter had advised his clients to treat the joint venture income as a gift from Parker. This testimony was uncontradicted. Moreover, because Hunter's testimony would have been cumulative, and maybe counterproductive -- focusing attention away from the primary issue of whether his clients were liable in the first place -- and because the subject of Hunter's advice was not peculiarly within his knowledge, *see McKay*, 886 F.2d at 1238, the tax court erred when it drew an inference adverse to the appellants. To hold otherwise would in essence require the attorney to testify in all cases involving an advice of counsel defense.

After reviewing the record, "we are left with the definite and firm conviction that a mistake has been made." *Chamberlain*, 66 F.3d at 732. The appellants did rely on their attorney's advice when they elected to treat the joint venture income as a gift from Parker. Furthermore, given the appellants' relative youth and inexperience in business matters, they acted with all the care a reasonably prudent person would exercise under similar circumstances. *See Reser*, 112 F.3d at 1271. Our laws demand nothing more. Thus, we hold that the Tax Court clearly erred when it sustained the imposition of negligence penalties against the appellants.

15

## B. SUBSTANTIAL UNDERSTATEMENT PENALTY

The second issue before this court is whether the Tax Court abused its discretion when it held appellants liable for the addition to tax for substantial understatement, pursuant to I.R.C. § 6661(a). *See Heasley v. Commissioner*, 902 F.2d 380, 385 (5th Cir. 1990). Section 6661 provides for an addition to tax equal to twenty-five percent of the amount of any underpayment attributable to a substantial understatement of tax. If a taxpayer is able to show that there was a reasonable cause for the understatement and good faith, which may stem from reasonable reliance on the advice of professional, the I.R.S. may waive the understatement penalty. *See Heasley*, 902 F.2d 384-85; *see also Reser v. Commissioner*, 112 F.3d 1258, 1271-72 (5th Cir. 1997).

First, as has been noted, the appellants reasonably relied on the advice they received from their attorney. I.R.S. acknowledges that "the extent of the taxpayer's effort to assess her proper tax liability under the law is the most important factor" in determining reasonable cause and good faith. *Heasley*, 905 F.2d at 385. Because of appellants' youth and inexperience in business, reliance on counsel, and proof of "good faith" in their position by reporting the transaction to the Service as to their father's potential liability, the conclusions this court reached in *Heasley* are controlling:

> Applying the I.R.S.'s own regulatory standards, we find that the I.R.S. abused its discretion by failing to waive the penalty in this case. We are at a loss to determine just

16

what the I.R.S. would find to be a reasonable cause given the Heasleys' experience, knowledge, and education. First, the Heasleys attempted to assess their proper tax liability by taking their taxes to a C.P.A., something they never did before. The accountant found no problem with the plan. While Danner suggested that the Heasleys use Smith, nothing else in the record connects the two. Therefore, considering this "most important factor," the Heasleys showed reasonable cause and good faith. Second, the Heasleys read the portions of the prospectus and other O.E.C. materials and relied on Danner to explain the rest. If neither Danner nor their C.P.A. found anything wrong with the investment, how could the Heasleys? Certainly, their failure to out-guess their financial advisor and accountant is not negligence. Finally, the Heasleys believed that they legitimately claimed the deduction and investment tax credit. Given the Heasleys' inexperience and limited knowledge about investing, and their level of education, their misunderstanding is reasonable. The I.R.S. abused its discretion by failing to waive the penalty and the tax court erred by upholding the I.R.S.'s decision.

*Id.*

Second, I.R.S. too narrowly interprets the meaning of the substantial authority defense on which appellants rely to defeat this penalty.[13] This case turned on one factual issue: when Parker made the gift to his daughters. If the gift was made before 1985, Tracy and Teresa are liable for the income they received in 1985; if it was effectively made in 1985, Parker is liable. The subsidiary facts relating to this transaction were complex, largely

---

[13]I.R.C. § 6661(b)(2)(B)(i) provided that any "substantial" understatement of tax "shall be" reduced "by that portion of the understatement which is attributable to []the tax treatment of any item . . . if there is or was substantial authority for such treatment . . . ."

17

undisputed, and not materially affected by the Tax Court's assessment of the sisters' lack of credibility. In a recent decision, the Eleventh Circuit explained that where the substantial authority issue turns on evidence going both ways, "there is substantial authority from a factual standpoint for the taxpayer's position. Only if there was a record upon which the Government could obtain a reversal under the clearly erroneous standard could it be argued that from an evidentiary standpoint, there was not substantial authority . . . ." *Osteen v. Commissioner*, 62 F.3d 356, 359 (11th Cir. 1995). Apart from trying to confine *Osteen* to its facts, an untenable position, I.R.S. does not demonstrate how its principle is inapt here. The government makes no effort to assert that the only rational tax treatment of the transaction was as a gift made before 1985.[14]

For these reasons, the I.R.S. abused its discretion in failing to waive the penalty and the Tax Court erred in upholding the I.R.S.'s decision. *See Heasley*, 902 F.2d at 385. It is clear upon review of the record that the appellants had substantial factual authority for the tax position they asserted and reasonably relied on the advice of their attorney.

---

[14]The dissent ignores *Osteen* and makes a legal argument that neither I.R.S. nor the Tax Court did, namely, that "substantial authority" means only legal, not factual authority.

18

## C.   FAILURE TO PROSECUTE

Because we have held that the sisters are not liable for negligence and substantial understatement penalties, we need not reach the merits of the dispute over Davis's possible failure to prosecute. Davis's derivative liability for his ex-wife's income vitiates a default judgment. The Tax Court decision holding the appellant in default for failure to prosecute his case is reversed.

## CONCLUSION

These appellants are not liable for negligence and substantial understatement penalties from their decision to treat the joint venture income as a gift. The decision of the Tax Court is **REVERSED.**

ENDRECORD

KING, Circuit Judge, dissenting:

In reversing the judgment of the tax court, the majority errs on two levels. First, under the guise of a review only for clear error, the majority rejects the tax court's determination that the appellants were liable for an addition to tax based upon their negligence pursuant to former § 6653 of the Internal Revenue Code. In so doing, the majority exceeds its authority as an appellate court by usurping the fact-finding function properly relegated to the tax court. Second, the majority concludes that the tax court erred in holding the appellants liable for an addition to tax based upon a substantial understatement of their tax liability because substantial authority within the meaning of former § 6661 of the Internal Revenue Code existed for the tax position taken by the appellants. In order to justify this conclusion, the majority adopts a construction of the substantial authority standard that fails to comport with the treasury regulations interpreting § 6661 and that strips the statute of much of its force as a deterrent of taxpayer misconduct. I respectfully dissent.

## I. Addition to Tax for Negligence

The majority improperly holds that the tax court clearly erred in finding that the appellants acted negligently in declining to report the joint venture income as a capital gain and that the appellants were therefore liable for negligence penalties pursuant to former § 6653(a) of the Internal Revenue Code. See 26 U.S.C.A. § 6653(a) (West 1989) (amended in 1989). Because the majority makes no mention of the burden of proof applicable to the parties'

dispute over the negligence penalty, it is worth noting here that the Commissioner's determination of negligence is presumed correct and that the taxpayer therefore bears the burden of proving the absence of negligence. See Westbrook v. Commissioner, 68 F.3d 868, 880 (5th Cir. 1995); Sandvall v. Commissioner, 898 F.2d 455, 459 (5th Cir. 1990).

The majority concludes that the tax court erred in declining to accept the appellants' contention that their failure to report the income from the joint venture on their 1985 tax returns did not constitute negligence because they made the decision based on the advice of counsel. In reaching this conclusion, the majority pays lip service to the fact that, as an appellate court, our review of the tax court's finding of negligence is limited to a review for clear error. See Streber v. Commissioner, ___ F.3d at ___ (5th Cir. 1998), Majority op. at 6 (citing Sandvall, 898 F.2d at 459). It then proceeds to conduct a thinly veiled de novo review of the facts, reversing the tax court's judgment regarding the negligence penalty merely because it reaches a different factual conclusion than that reached by the tax court. The majority's conclusion that "the overwhelming weight of the evidence . . . supports the proposition [Edwin] Hunter did in fact tell the appellants that they should treat the joint venture income as a gift from Parker," Streber, ___ F.3d at ___, Majority op. at 9, simply cannot withstand scrutiny.

First, the majority points to the testimony of Tracy Streber, Teresa Deloney (by affidavit and deposition), Betty Berwick, and Steve Davis as establishing that Hunter told the appellants that they should treat the joint venture income as a gift. Credibility assessments regarding this testimony were exclusively within the province of the tax court, as it was the trier of fact. See Durrett v. Commissioner, 71 F.3d 515, 517 (5th Cir. 1996). The tax court explicitly concluded that it "did not find [Tracy and Teresa] to be credible witnesses" and therefore accorded their testimony "little weight." While it is not our place as an appellate court to strictly scrutinize the tax court's credibility determinations, it is worth noting that the court had every reason to make the credibility assessments that it did in this case.

Tracy's testimony at trial was exceptionally vague and riddled with lapses of memory. For example, when asked by the court what advice Hunter had given Tracy and her sister, Tracy replied as follows: "I don't--well, there was this chalk talk thing, and there was--and ultimately it was, well it was a gift. And we--you know, that is--so your dad owes the tax." When answering a number of related questions posed by the court regarding the sisters' meeting with Hunter, Tracy responded that she could not remember or did not know. The tax court could properly decline to credit Tracy's testimony. See id.; see also MacGuire v. Commissioner, 450 F.2d 1239, 1244 (5th Cir. 1971) ("'The Tax Court not only may, but should, base its findings on the testimony it believes to be true,

rejecting after due consideration that which it believes is false.'" (quoting <u>Boyett v. Commissioner</u>, 204 F.2d 205, 208 (5th Cir. 1953))).

The tax court concluded that Teresa, whose affidavit and deposition were entered into evidence, had "failed to tell the truth" in "various important respects." The court specifically concluded that Teresa had previously misrepresented her involvement in reporting her father's alleged understatement of his tax liability to the IRS. In response to interrogatories sent to her in the discovery phase of the trial, Teresa made the following statement:

> I never gave advice to the Internal Revenue Service about shortcomings in the income tax returns filed by Larry and Martha [Parker] for 1985, nor do I have personal knowledge that any relative or counsel did so.

When later asked in deposition whether she provided the IRS with any communication regarding her father's tax liability, she stated that she did not remember making such a communication. When asked if she had heard of anyone else making such a communication, she stated that she "ha[d] heard" during the pretrial proceedings "[t]hat it was done." When asked by whom, she responded "by myself and my husband through our attorney." When asked in a later deposition session what this earlier statement meant, Teresa responded, "It means that all I have heard in these proceedings is that--that Steve and I were supposedly the informants, but I have no knowledge of who informed, when it was done. I did not do it. He did not do it." A reward application bearing Teresa's signature

and containing information regarding her father's tax liability was filed with the IRS and entered into evidence. Additionally, an IRS memorandum reciting that Teresa was in attendance at a meeting with an IRS special agent in 1986 at which she provided information relating to her father's 1985 tax return was also entered into evidence. Based on its conclusion that Teresa had testified falsely about her involvement in informing on her father to the IRS, the tax court had every right to infer that Teresa had also testified falsely about the advice that she received from Hunter and her reliance on it. See Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984) (concluding that the tax court could properly infer that the taxpayer had testified falsely about a particular matter based on the taxpayer's false testimony regarding a related matter).

The majority also notes that two other witnesses--Berwick and Davis--indicated that Hunter felt that Tracy and Teresa could legally treat the joint venture income as a gift from their father and decline to report it as a capital gain. As noted earlier, the tax court had the exclusive authority to make credibility assessments regarding this testimony. More importantly, however, none of the witnesses established that Tracy and Teresa provided Hunter with all of the information relevant to an informed determination of the appropriate tax treatment of the joint venture income.

In order to take advantage of the defense to negligence penalties provided by good-faith reliance on the advice of counsel, a taxpayer must prove that the advice of counsel allegedly relied upon was "based on knowledge of all the facts" relevant to the advice given. See Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), cited with approval in Heasley v. Commissioner, 902 F.2d 380, 383-84 n.8 (5th Cir. 1990). The taxpayers did not meet this burden here.

Tracy testified at trial that she did not provide Hunter with any documents relating to the joint venture and that she could not remember whether anyone else provided Hunter with any such documents. Teresa's affidavit states that she and Davis "provided Mr. Hunter numerous documents [they] believed relevant to this situation and other legal matters [they] were discussing with him," but does not specify the exact nature of those documents. Davis testified that Teresa provided Hunter with some documents, but was vague as to their contents. When asked what kind of documents Teresa provided to Hunter, Davis stated, "She had, you know, documents how the deal--you know, wasn't a lot of documents, but she did have some as far as the deal--land deal . . . ." As to what Hunter was told at the meeting with the sisters, Tracy testified that she "[could] only speculate" about what she had told Hunter and that she "[could not] speak for [her] sister." Such testimony fails to establish that Hunter knew all of the facts relevant to a determination of whether the joint venture income

constituted a gift and therefore fails to establish that Tracy and Teresa did not act negligently.

The majority next concludes that, in light of the fact that Hunter assisted the appellants in reporting on Parker to the IRS, thereby subjecting them to heightened scrutiny regarding their treatment of the joint venture income, "it is hard to understand how the Tax Court could have concluded that Hunter would have advised the appellants to take any position other than the one they adopted in this matter." Streber, ___ F.3d at ___, Majority op. at 10. This analysis is problematic on two levels. First, the majority takes it upon itself to theorize about the cost-benefit analysis that the appellants conducted in weighing the cost of reporting to the IRS and thereby increasing their risks of an audit against the benefit of a potential cash reward for providing the IRS with what the majority acknowledges was information of "substantial value." Id. at ___, Majority op. at 11 n.9. Second, based on an assumption that Hunter provided the appellants with sound advice regarding the risks of heightened IRS scrutiny that would flow from reporting on Parker, the majority concludes that Hunter must have provided advice regarding the appropriate treatment of the joint venture income that, at least in the view of the appellants, was so unsound that it constituted legal malpractice.[15]

---

[15] The appellants have filed a legal malpractice action against Hunter, the law firm where he is employed, and other attorneys related to Hunter's alleged advice that they treat the

The majority also concludes that the tax court erred in drawing a negative inference from the fact that Hunter did not testify at the trial. In support of this conclusion, the majority states that, unless a potential witness has information "peculiarly within his knowledge," a party should feel free not to produce the potential witness "'without any apprehension' that a court will draw a negative inference." Streber, ___ F.3d at ___, Majority op. at 13-14. (quoting McKay v. Commissioner, 886 F.2d 1237, 1238 (9th Cir. 1989), and John Henry Wigmore, Evidence § 287, at 202-03 (Chadbourn rev. 1979)). The legal authority that the majority cites for this proposition fails to bear it out.

First, McKay does not stand for the proposition that the trier of fact may draw a negative inference from a party's failure to produce a witness only when that witness possesses information peculiarly within his knowledge. The sentence containing the passage quoted by the majority states the following: "Moreover, petitioner declined to testify and since the fact at issue was peculiarly within his knowledge, the court properly concluded his testimony would be unfavorable to him . . . ." McKay, 886 F.2d at 1238. The most that one can glean from this passage is that the Ninth Circuit has concluded that a scenario in which a party declines to produce a witness to present testimony peculiarly within the witness's knowledge constitutes one circumstance in which the fact-finder may properly infer that the witness's

joint venture income as a gift for tax purposes.

27

testimony would be unfavorable to the party. In no sense does the Ninth Circuit's language preclude the existence of other such circumstances.

Second, Wigmore does not support the evidentiary rule advocated by the majority. In the passage cited by the majority, Wigmore states the general rule regarding when the trier of fact may draw negative inferences from a party's failure to produce a witness within his control as follows:

> [T]here is a general limitation (depending for its application on the facts of each case) that the inference [that a witness would testify in a manner unfavorable to the party that declines to produce him] cannot fairly be drawn except from the nonproduction of witnesses whose testimony would be <u>superior</u> in respect to the fact to be proved.

WIGMORE, <u>supra</u>, § 287, at 203. One can hardly doubt that the testimony of Hunter--the purveyor of the legal advice at issue here--regarding the substance of that advice would have been in some sense superior to that of the witnesses who testified regarding the matter. Indeed, given the vague and conclusory nature of the testimony of the witnesses at trial regarding Hunter's advice and Tracy's substantial lapse of memory as to its substance, one might even conclude that the details of that advice were peculiarly within Hunter's knowledge.

More importantly, however, in the same paragraph quoted by the majority, Wigmore goes on to say that the general limitation on the fact-finder's authority to draw negative inferences from a party's failure to produce a witness rests on "grounds of expense and

28

inconvenience" and "should not be enforced with any strictness; otherwise it would become practically objectionable." Id. In this case, the expense and inconvenience of placing Hunter on the witness stand would have been negligible. Not only was he available to the appellants, he was in the court room throughout the trial. Furthermore, the tax court found--and the appellants do not dispute--that the Tax Court Rules of Practice and Procedure would have allowed Hunter to testify without disqualification. See 26 U.S.C. foll. § 7453 R. 24(f).

The majority also contends that a conclusion that the tax court could properly draw a negative inference from Hunter's failure to testify "would in essence require the attorney to testify in all cases involving an advice of counsel defense." Streber, ___ F.3d at ___, Majority op. at 15. This is simply not true. Allowing the tax court to draw such an inference does not imply that the testimony of counsel is necessary to establish a viable advice of counsel defense. It does not imply that the court must draw such an inference or that, when the court does draw such an inference, it is foreclosed from concluding that the other evidence in the record nonetheless establishes that the taxpayer reasonably relied on the advice of counsel.

In sum, given (1) the tax court's exclusive power to make credibility assessments regarding the witnesses at trial, (2) the paucity of evidence regarding what information Hunter had when he gave the advice at issue here, and (3) the tax court's discretion

29

to draw a negative inference from Hunter's failure to testify, the tax court had ample basis on this factual record for concluding that the appellants did not bear their burden of proving that they were shielded from liability for negligence by good-faith reliance on the advice of counsel.  As an appellate court, our inquiry properly ends there.

## II.  Substantial Understatement

The majority next errs in concluding that the tax court abused its discretion in holding the appellants liable for a substantial understatement penalty pursuant to former § 6661 of the Internal Revenue Code.  Section 6661, repealed after the tax years at issue in this case, provided for the imposition of a penalty based on a taxpayer's substantial understatement of tax liability for a taxable year.  See 26 U.S.C.A. § 6661(a) (West 1989) (repealed in 1989).  The section provided that, for purposes of computing the penalty, the amount of the taxpayer's understatement of tax liability is "reduced by that portion of the understatement which is attributable to . . . the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment."  Id. § 6661(b)(2)(B)(i).  The taxpayer bears the burden of proving the existence of substantial authority.  See Westbrook, 68 F.3d at 882.

The majority concludes that, from a factual standpoint, substantial authority for a taxpayer's position within the meaning of § 6661 exists unless "'there was a record upon which the

30

Government could obtain a reversal under the clearly erroneous standard'" had the tax court accepted the taxpayer's position. Streber, ___ F.3d at ___, Majority op. at 18 (quoting Osteen v. Commissioner, 62 F.3d 356, 359 (11th Cir. 1995)). This construction of the substantial authority standard contravenes § 6661's interpretive regulations. Section 1.6661-3 of the Treasury Regulations indicates that § 6661's substantial authority standard does not contemplate substantial evidentiary authority. Rather, the regulation provides an exclusive list of potential sources of authority, all of which are legal sources, which indicates that § 6661 contemplates only substantial legal authority. Section 1.6661-3 provides in relevant part as follows:

> Types of authority. In determining whether there is substantial authority . . . , only the following will be considered authority. Applicable provisions of the Internal Revenue Code and other statutory provisions; temporary and final regulations construing such statutes; court cases; administrative pronouncements (including revenue rulings and revenue procedures); tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; and Congressional intent as reflected in committee reports, joint explanatory statements of managers included in conference committee reports, and floor statements made prior to enactment by one of a bill's managers.

26 C.F.R. § 1.6661-3(b)(2) (1997) (emphasis added). Noticeably absent from this list of potential sources of authority is any mention of factual evidence favorable to the taxpayer's position.

Furthermore, the majority's construction of the substantial authority standard implies that, in many circumstances, if a taxpayer is able to survive summary judgment, he is shielded from

31

liability for substantial understatement penalties because substantial authority--in the form of some evidence--supports his tax position.[16]  Moreover, when a taxpayer's entitlement to a particular tax benefit hinges upon facts that will be elucidated by witness testimony, the taxpayer need only lie about the facts that would entitle him to the benefit in order to shield himself from liability for a substantial understatement penalty resulting from his improperly claiming the benefit.  In such a circumstance, the taxpayer's testimony would constitute some evidence indicating his entitlement to the benefit, and, the majority opinion in this case notwithstanding, it is doubtful that we would be in a position on appeal to conclude that the trial court would have clearly erred had it credited the taxpayer's testimony.  Surely Congress did not intend to impose such a toothless penalty for substantial understatement of tax liability.[17]

---

[16]  It is true that "[a] finding is clearly erroneous when, although some evidence supports the decision, we are 'left with the definite and firm conviction that a mistake has been committed.'" United States v. Tello, 9 F.3d 1119, 1122 (5th Cir. 1993) (quoting United States v. United States Gypsum Co.,    333 U.S. 364, 395 (1948)).  However, on numerous occasions, we have concluded that a factual finding is not clearly erroneous based on an inquiry that appears to begin and end with a determination that the record contains some evidence supporting the factual finding. See, e.g., United States v. Jobe, 101 F.3d 1046, 1066 (5th Cir. 1996); Lewis v. NLRB, 750 F.2d 1266, 1278-79 (5th Cir. 1985).

[17]  It is worth noting that the majority's construction of the substantial authority standard also provides a disincentive for taxpayers to settle with the IRS in situations in which they are potentially liable for substantial understatement penalties.  If the taxpayer is able to create a fact issue about which reasonable minds could differ regarding his entitlement to a particular tax benefit, he can avoid liability for substantial understatement

The majority's erroneous construction of the substantial authority standard is rendered even more unfortunate by the fact that it is entirely gratuitous. The majority independently concludes that the IRS abused its discretion by declining to waive the substantial understatement penalty pursuant to § 6661(c) because the appellants relied in good faith on the advice of counsel in choosing to treat the joint venture income as a gift. As I indicated above in my discussion of the majority's treatment of the tax court's imposition of negligence penalties, the majority errs in this regard by making an independent assessment of the factual issue of whether the appellants truly acted in good-faith reliance on the advice of counsel. However, the majority's conclusion that the appellants were entitled to waiver of the penalty provides an independent, albeit legally unsound, basis for its decision to reverse the tax court's imposition of the substantial understatement penalty. Nevertheless, the majority proceeds to heap one legal error onto another by promulgating in dicta a construction of the substantial authority standard that fails to comport with the treasury regulations interpreting § 6661 and that robs the statute of much of its value as a deterrent of taxpayer misconduct. I therefore respectfully dissent.

---

penalties. In some circumstances, this heightened incentive may be sufficiently strong that it convinces the taxpayer to proceed to trial rather than settle the dispute.